Cause No. 14-14-00997-CR
Cause No. 14-14-00999-CR

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS

NOV 03 2015

CHRISTOPHER A. PRINE
CLERK

IN THE FOURTEENTH COURT OF APPEALS

## GARY LEE MOUNT, APPELLANT
## VS.
## THE STATE OF TEXAS, APPELLEE

On Appeal from the 248th Criminal District Court of Harris County, Texas, Cause Nos. 1449195, 1449196. Honorable Katherine Cabaniss, Judge Presiding.

## A PRO SE BRIEF FOR APPELLANT

Dorm: 7I-12-Bottom

GARY LEE MOUNT
PRO SE
TDCJ# 1969963
McCONNELL UNIT
3001 S. EMILY DRIVE
BEEVILLE, TEXAS
78102

## IDENTITY OF PARTIES AND COUNSEL

page:

(1-2)

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 38.1 (a) the following are parties or counsel to the judgement appealed from:

Presiding Judge:
The Honorable Katherine Cabaniss
248th Criminal District Court
1201 Franklin
Houston, Texas 77002

Appellant PRO SE:
Gary Mount
TDCJ#1969963
McConnell Unit
3001 S. Emily Drive
Beeville, Texas 78102

Attorney's For State:
Mr. John Wakefield (At Trial)
Harris County District Attorney's Office
1201 Franklin
Houston, Texas 77002

Mr. Alan Curry (On Appeal)
Harris County District Attorney's Office
1201 Franklin
Houston, Texas 77002 [i]

## IDENTITY OF PARTIES AND COUNSEL

Attorney's For Appellant:
Mr. Theodore Haynes (At Trial)
P.O. Box 300833
Houston, Texas 77230

Ms. Deborah Summers (On Appeal)
11210 Steeplecrest, Suite: 120
Houston, Texas 77065

PRO SE:
Gary Mount
TDCJ# 1969963
McConnell Unit
3001 S. Emily Drive
Beeville, Texas 78102

i

# TABLE OF CONTENTS
pages:
("1-2)

# TABLE OF CONTENTS

IDENTITY OF PARTIES: [i] (1-2)

TABLE OF CONTENTS: [ii] (1-2)

INDEX OF AUTHORITIES: [iii] 1-10

STATEMENT OF THE CASE: [ix] 1

STATEMENT REGARDING REFERENCES TO THE
RECORD:                                    [x] 1

ISSUE PRESENTED:                           [x] 1

THIS PRO SE APPEAL BRIEF PRESENTS
THESE ISSUES FOR REVIEW WITH MERIT.

ISSUE: (2)  SEE: Pages 1 thru 4

State failed to Correct Perjured Testimony which
tainted-Influenced, the minds of the jurors,
and did contribitate to the defendants
conviction and sentence and prejudice the
defendant so from geting a fair and impartial
trial.

( [ii] )

# TABLE OF CONTENTS

STATEMENT OF FACTS: 1-12

STATEMENT OF FACTS IN SUPPORT OF CASES CITED: 1-6

SUMMARY OF THE ARGUMENT: 1-4

ARGUMENT: 1-14

SUMMARY OF THE CASES: 1-6

EVIDENCE: 1-19

PRAYER: (1)

CERTIFICATE OF SERVICES: (1)

# INDEX OF AUTHORITIES

page:
(1-10)

# INDEX OF AUTHORITIES

State Cases:

Adams, 768 S.W. 2d 281, 293
[Tex. Crim. App. 1989]

Alcorta V. State of Texas, 355 U.S. 28. 78 S.CT. 103,
2 L. Ed. 2d 9; United States ex rel.

Avery V. State of Georgia, 345 U.S. 559, 561. 73
S.CT. 891, 892. 97 L. Ed. 1244:

Ashcraft V. State of Tennessee, 322 U.S. 143, 149, 64
S.CT. 921, 923, 88 L. Ed. 1192;

Brady V. Maryland, 373 U.S. 83, 83. S.CT. 1194 (1963)

Bailey V. State of South Carolina, 289 U.S. 412,
420. 53 S.CT. 667, 670. 77 L. Ed. 1292.

Based On Brady V. Martcand, 373 U.S. 150 92
S.CT. 763, 31 1. ed. 2D. 104 (1972)

Chabot, 300 S.W. 3d 768 [Tex. Crim. App. 2009]

Carmona, 185 S.W. 3d 492 [Tex. Crim. App. 2006]

Cooper V. Aaron, 358 U.S. 1, 78 S.CT. 1401, 3 L. Ed.
2d 5

(dissenting opinion): Cassell V. State of Texas,

# INDEX OF AUTHORITIES

, 339 U.S. 282, 283. 70 S.CT. 629, 94 L.Ed. 839;

Creswill V. Grand Lodge Knights of Pythias, 225 U.S. 246, 261, 32 S.CT. 822. 56 L.Ed. 1074.

Davis V. Wechsier, 263 U.S. 22, 24. 44 S.CT. 13, 14. 68 L.Ed. 143;

~~Delaware~~

Feiner V. People of State of New York, 340 U.S. 315, 322, 323 - not. 4. 71 S-CT. 303, 307, 95 L.Ed. 267

Fierro, 934 S.W. 2d 370, 373. (Tex. Crim. App. 1996)

Giglio. V. U.S., 405 U.S. 150, 31 L.Ed 2nd 104, 92 S. CT. 763

GHAHREMANI, 332 S.W. 3d 470 (Tex. Crim. App. 2011) LEXIS 330

Haley V. State of Ohio, 332 U.S. 596, 599. 68 S.CT. 302. 303. 92 L.Ed. 224;

Kern-Limerick, INC. V. Scurlock, 347 U.S. 110, 124, 74 S.CT. 403, 410, 98 L.Ed. 546.

Keeter V. State, 175 S.W. 3d 756. (Tex. Crim. App. 2005)

③
State
Cases

# INDEX OF AUTHORITIES

Leyra V. Denno, 347 U.S. 556, 558, 74 S.CT. 716, 717-98 L. Ed 948:

Mooney V. Holohan, 294 U.S. 103, 55 S.CT. 340, 79 L. Ed 791

Mesarosh V. United States, 352 U.S. 1, 77 S.CT. 1, 1L. Ed. 2d 1.

Martin V. Hunter's Lessee, 1 Wheat. 304, 4 L. Ed. 97:

Malinski V. People of State of New York, 324 U.S. 401, 404, 85 S.CT. 781. 783, 89 L. Ed. 1029.

Niemotko V. State of Maryland, 340 U.S. 268, 271, 71 S.CT. 325, 327, 95 L. Ed. 267:

Napue V. People of the State of Illinois, 360 U.S. 264, 79 S.CT. 1173 3L. Ed. 2d 1217.

Pyle V. State of Kansas, 317 U.S. 213, 63 S.CT. 177, 87 L. Ed. 214.

People V. Savvides, 1 N.Y. 2d 554, 557, 154 N.Y.S. 2d 885, 887. 136 N.E. 2d 853, 854-855.

Payne V. State of Arkansas, 356 U.S. 560, 562, 78 S.CT 844, 847, 2 L. Ed. 2d 975;

iii

# INDEX OF AUTHORITIES

④
State
Cases

Ross v. State, 233 S.W. 2d 126,156 [Tex. Crim. App. 1950] Certiorari granted 71 S.CT 529, 340 U.S. 946, 95 L.Ed. 682, reversed 71 S.CT.742, 341 U.S. 918, 95 L.Ed.1352.

Roth v. United States, 354 U.S. 476, 497, 77. S.CT, 1304, 1315 1 L.Ed 1498

Smith v. State of Texas, 311 U.S. 128.130, 61 S.CT.164, 165.L. Ed.84.

Stroble v. State of California, 343 U.S. 181,190, 72 S. CT.599, 603, 96 L.Ed. 872.( dissenting opinion).

Sterling v. Constantin, 287 U.S. 378.398, 53 S.CT.190 195, 77 L.Ed.375;

Southern Pacific Co. v. Schuyler, 227 U.S. 601, 611. 33 S.CT. 277. 280, 57 L.Ed 662;

Thomas v. State, 841 s.W. 2d 399, 404 (1992)

United States v. Bagley, 473 U.S. 667, 681-82, 105 S.CT. 3375 87 L.Ed. 2d 481 (1995)

Web v. State, 278 s.w. 2d 158, 161 [Tex. Crim. App. 1955]

c

# INDEX OF AUTHORITIES

State Cases

Whitman V. Wilson, 318 U.S. 688, 63 S.CT. 840, 87 L.Ed 1083 and:

White V. Ragen, 324 U.S. 760, 65 S.CT. 978, 89 L.Ed. 1348.

Ward V. State, Of Texas, 316 U.S. 547, 550. 62 S.CT. 1139, 1141, 86 L.Ed. 1663.

2L Ed 1575, 3L Ed 2d 1991

13 Ill.2d 566, 571, 150 N.E 2d 613, 614.

83 S.CT. 1194 (1963)

79 S.CT. 1173, 3L.Ed.2d 1217



# INDEX OF AUTHORITIES

## \CONSTITUTIONS/

U.S. CONST. amend. (14)



# INDEX OF AUTHORITIES

## \STATUTES/

Tex. Penal Code Ann. §§ 20.04
(Vernon Supp. 2014)

Tex. Penal Code Ann § 22.021
(Vernon Supp. 2014)

Tex. Penal Code Ann. § 3.02
(Vernon Supp. 2014)

Tex. Penal Code Ann. § 12.42
(Vernon Supp. 2014)

Tex. C.C.P. Art 44.29
(Vernon's Ann. 2000)



⑧

# INDEX OF AUTHORITIES

## RULES

Tex. R. App. P. 38.1 (a)

# INDEX OF AUTHORITIES

## Federal Cases

Almeida V. Baldi, 3rd Cir., 195 F.2d 815, 33 A.L.R. 2d 1407; United States ex rel.

Curran V. State of Delaware, 3 Cir; 259 F.2d 707.

De Marco V. U.S., 928 F.2D.1074 (11th Cir.1991)

Gonzalez-Soberal V. United States, 244 F.3d 273 (1st Cir.2001)

Guzman V. Secretary, Dept of Corrections, 663 F.3D-1336 (11th Cir.2011)

Griffin V. Pierce, 622 F.3D.831. (7th Cir. 2010)

Jones V. Commonwealth of Kentucky, 6th.Cir., 97 F.2d 355,338, with in re Sawyer's Petition. (7th Cir., 229 F.2d 805,809.

Montgomery V. Ragen, D.C., 86 F.Supp.382 See generally annotation. 2 L.Ed.2d 1575.

Moore V. Marr, 254 F.3D. 1235, 1241. (10th Cir.2001)





# INDEX OF AUTHORITIES

## Federal Cases

Steinkuehler v. Megchner, 176 F.3d. 441, 445 (8th Cir. 1999)

Thompson V. Dye, 3 Cir., 221 F. 2d 763; United States ex rel.

United States v. Tucker, 716 F. 2D. 576, 585, 587. (9th Cir. 1983)

United States v. Webster, 392 F.3d 787, 801. (5th Cir. 2004)

Van Liew v. U.S., 321 F. 2d 674 (Tex.) 1963)

## STATEMENT OF THE CASE

page:

(1)

# STATEMENT OF THE CASE

The Appellant was charged by indictments with the offense of Aggravated Sexual Assault and Aggravated Kidnapping in cause numbers 1449195 and 1449196 (CR 1 at 15; CR 2 at 13). Tex. Penal Code Ann. §§ 20.04, 22.021 (Vernon Supp. 2014) The cases arose out of the same transaction and were tried together (CR 1 at 99; CR 2 at 105). Tex. Penal Code Ann. § 3.02 (Vernon Supp. 2014). A few weeks before the trial, new counsel for the Appellant substituted in on both cases (CR 1 at 518; CR 2 at 473).

The Appellant plead not guilty and a jury was selected on December 1, 2014 (RR 2 at 142). The Appellant was convicted on December 4, 2014 (RR 5 at 85).

The Appellant was enhanced with two prior felony convictions and faced a minimum of 25 years on each case (CR 1 at 15; CR 2 at 13). Tex. Penal Code Ann. § 12.42 (Vernon Supp. 2014). After hearing punishment evidence, the jury sentenced the Appellant to 75 years confinement in the Texas Department of Criminal Justice on each case (RR 7 at 22; CR 1 at 620; CR 2 at 584). Appellant filed a timely, written Notice of Appeal on December 5, 2014 (CR 1 at 638; CR 2 at 595)

# STATEMENT REGARDING REFERENCES TO THE RECORD

page:
(1)

# STATEMENT REGARDING REFERENCES TO THE RECORD

The Clerk's record in 1449195 will be cited as "CR(1)". The Clerk's record in 1449196 will be cited as "CR(2)". The reporter's record for the trial consists of eight volumes and will be cited as " ~~States~~ "RR(1), RR(2) etc ..." Exhibits will be cited as "State's Exhibits 1, 2 etc ...

X

# ISSUE

State failed to correct perjured Testimony which tainted-Influenced, the minds of the jurors, and did contributate to the defendants conviction and punishment and prejudice the defendant so from geting a fair and impartial trial.



# STATEMENT OF FACTS

page:

(1~12)

# STATEMENT OF FACTS

Dec 1, 2014 Deputy Anthony Glenn testified that there is no street lights out there now I don't no whats wrong with his eyes, for one there is a street light in Gary Caskey's front yard. he also state that there is a bump on the little 9 year old girls head. Which you heard what the Lead investigator James Dousay said there was no goose egg on the girls head besides that its hearsay because the 9 year old girl was not in court on the day of trial which deputy Glenn, Gary Caskeys, Amanda Smith, District Attorney used Kaley Smith's Testimony and what she said all threw trial which is a violation of my 6th Amendment. The sixth Amendment right to present a complete defense encompasses a petitioner's rights under the confrontation clause to rebut the states evidence through Cross-examination, which she was not at trial or even in the state of Texas during trial, which she did not see nothen that night. Because she was asleep in the living room and lied about the issues she saw, So the District Attorney knowd this was Inflamatory evidence when he presented it threw out trial to Inflame and tainted the jurys mind which denied me Fair and imparcial trial. All threw trial was nothing but perjury testimoniy giving by the Victum, witnesses

② and by state expert witnesses, I ask the high courts to go threw the evidence that I have taok out the trial transcript and you will see where I wrote perjury then below I wrote robutte. I've wrote down the Reporters Record where its found at and the state's Exhibits where the perjury is found in it. I could explain it to you in the STATEMENT OF Facts but this Law Library Limits you to 100 sheets of a Brief I pray to the court of Appeals to except this brief I'm over the page limit which I did file a Extention of time motion and Extention of Paper and pages. I want to explain a little to yall The District Attorney knows all this was perjury testimony when it was giving Now I ask yall and pray to the Courts to look over the evidence pages: 1-61 and you will see what I'm saying Deputy Glenn just lied like cazey concerning me when he said I jumped out the drivers door. You heard the victim he went out the passanager door My drivers door does not open from the inside or the outside its jammed. So even Christy Smejkal the Forensic Expert for the state committed aggravated perjury on the witness stand

under sworn oath. She stated my sperm was in Amanda Smiths anus the District Attorney also said the same thing, but look at what. State expert: Brittney Gonzalez stated that the perianul swab was negative for sperm. So this is just some of the perjury testimony that was giving and thay knowed it was perjury when it was giving which violates my Federal Constitution of the U.S. (14) Amendment. I want to mention a issue Deputy Richard Jenkins told yall. He said after the Aggravated Kidnapping and the Aggravated Sexual Assault happened when thay had Amanda Smith in the Ambulance on 65 pine street thay said she was not allowed to go back in the house that morning of 1-19-13. But the D.A. ask her where her black pajamass prants was she said I don't no. But Deputy Jenkins asked her and she said thay are in Gary Caskeys bedroom at the foot of his bed whene I took them off. Now she stated she had never had sex with me are Gary Caskey. Now when I surposed to of took her out the house Gary Caskey said she didn't have no pants on. Because she was having sex with Gary Caskey in his room when I caught them. She

# STATEMENT OF FACTS

lic'd to yall under oath about this and committed Aggravated perjury. Now them pajama pants was not in the suburban when I was supposed to of took her in the woods and under a bridge and rape her and beat her up. Now my seman and another male seman was found in them pajama's. Now if she haven't had sex with me before how is my seman in them pajama pants that was collected by Deputy Jenkins after the crime had be committed out of the house when Amanda was in the Ambulance Gary Caskey, and Amanda Smith both said all she had on when she left the house that morning was a T-shirt the gray sweat pants was also got out the house that morning after the crime had happened for Amanda to put on and wear which came out my bedroom in the house which is my sweat pants so my DNA is in them any way just like the Orange and Black blanket came of my bed. I ask all yall to look at all this evidence on page3: (1-61) and decide. Because the testimony and the lies and perjury is intense. They said I got up on the witness stand during the punishment stage and admitted

to during these crimes, now I fought these charges for (2) years in the county jail I didn't testify during the guilt and innocence stage, Because of my prior convictions now why would I get up there during the punishment stage and admitt to these acts and No that I'm fixing to file a appeal on it. Plus the jury had done found me guilty already. They artered the transcript to say what they want it to say. Because during trial I wrote down what each Witness said when thay testifie Like Amanl Smith ~~said~~ said She said on her Audio Statement ~~allMan~~ that I took her to Secluded wooded area on Cherry Larual now during trial she said it was on Holly Lane and it says in the police report cherry Larual. I just wanted to point this out and She said and the State expert said I choked her to steep 7 times that night to the Blood verrsels pop'd in her eyes Forensic Expert Christy Smejkal said if you choke somebody by the neck you would leave DNA. Now Item 7-1 and 8-1 is neck swabs my DNA was not on her neck no where But there was a male contributer to her neck. Now the DNA said I beat her on her groin

and on her right side somewhere but the DNA test said I was excluded from this test. But there was a male DNA found on them but it wasn't mine. L. Breast swab, right, Breast swab I was excluded from these also but there was another male DNA present. There was another Male DNA found in her viginal also besides mine. But I had consentual sex with her Friday morning and Friday night 1-18-13 Before this happened early hours of Saturday morning 1-19-13 I was excluded from her dislocated cast arm she had that she said I was holden on to this arm for leveirage I my DNA was not on it but there was another DNA from a male on it. I was excluded from all the evidence except ((Grey Sweat pants took out the house after the crime had happened for Amanda to put on and wear thay came out my bedroom)) ((Black and orange Blanket came off my Bed in the house it was not in the vehicle)) ((Black Pajama pants, Came out the house by deputy Jenkins after the crime had happened he said thay was not part of the crime because thay was found in Gary Caskeys bedroom when Amanda was in the

⑦

in tho Ambulance but he put them in a bag in the frunk of his car thay was not submitted for DNA Yesting until 1-22-13 3 days latter. Now the Investigater James Dausay says he picks up a Gray Jacket and a Black and Orange blanket (2) days later after the incident on 1-19-13 Because Amand Smith calls him later and says she has more evidence for him to pickup this was two days after 1-19-13 But these (2) Items was never submitted for DNA Yesting until Jan 31, 2013 wow! I think there is a little trampering with evidence here if you don't mind me saying that. I ask that yall go over this with a good look over because you will see the lie's and perjury just like I do and just like my Lawyer pointed out in his closing argument and filed a instructed verdict that there was insufficient Evidence to convict me on these (2) Causes ~~XXXXXXXXXX~~

~~XXXXXXXX~~

I would also point out what my Lawyer said during his closing argument about the perjury testimony and the facts that was not right this is what he had to say about it

# STATEMENT OF FACTS

⑧

Mr. Haynes Trial Counsel

I would request that there isn't sufficient enough evidence to convict Mr. Mount. This case should be dismissed. And that there be an instructed verdict stating that this the two causes of actions agaisnt Mr. Mount be dismissed based upon lack of evidence.

There was an allegation with regard to her elbow and the split that she was wearing that Mr. Gary Mount dragged her by the splint or used the splint some kind of way to abduct her. But of all those DNA test that we got there, there was none of Gary Mount's DNA on that splint or any wrapping or bindings by him. Not one inkling. Not even when they used Kary Mullis polymerase chain reaction which magnifies DNA to a greater level even when it's minuture. Still couldn't find any of his DNA on that wrapping with regard to her arm.

States Exhibit (81 page 2 of 8) on Item 16B I Gary Mount could not be excluded as a contributer on this. Done by Christy Smejkal forensic Expert for State. But now in RR5 at 36 I couldn't included him either. And I couldn't do those statistics. So all I could say was there was insufficient information to include him. In RR5 at 64) I wanted to point to your attention about a situation where an officer came before you and said that there was some sort of a white T-shirt, that

Gary Mount was wearing. And he said that because of the fact that there was dew on the ground and because it had gone into night and early morning, when they got out there because of the remote location, because the fact there was dew on the ground, the shirt had no dew on the ground, because of the fact that the dog hit on the shirt, he felt that the shirt belonged to my Client, Gary Mount. However, in the testimony of both Amanda Smith, the alleged victim, as well as Gary Caskey, neither one of them could recall if my client was even wearing a shirt during that night. Not one. Amanda Smith could not say that Gary Mount was ever wearing a shirt that night and didn't know what color shirt he was wearing if he was wearing a shirt. neither could Gary Caskey who was not in a situation where he felt threatened. Obviously he wasn't. He stood supposedly in the room between them. So obviously he didn't feel too threatened by Mr. Gary Mount.

RR.56 & 64 and 65) I want to call your attention and its your duty, as I told you, to look at the testimony of the (officers) and all of the people involed in this case and determine their credibility. So I'm not saying they're not credible or credible. That's your job to determine whether they're credible or not credible.

RR5 at 65    Amanda Smith got on the witness stand and said that there is no way that she could ever enter into her vehicle from the driver's side because that driver's side door was jammed shut. And she testified that people were coming in and out of her car using the passenger side. But the (Police Officer)( Deputy ~~Broderick~~ Glenn that testified said that he distinctly saw Mr. Gary Mount come out of the driver's side ~~door~~ and run into the woods. That's what he testified to under oath, sworn testimony.

I'm not saying he's a bad police officer. I'm not saying he's lying. I'm saying he forgot what happened that night. I'm saying ~~he didn't quite~~ that in his excitement of doing all those things and trying to perform his duties that he didn't quite get it right. And if he didn't ge that point right, is there some other point that he didn't get right also, too? If these two people, Gary Caskey and RR5 at 66) Amanda Smith, don't remember that there was a T-shirt that my client was wearing or whether or not he was wearing a T-shirt, did they leave out something else? Was there something else missing? Did they distort the facts in something else? RR5 at 67) And here's the thing, he didn't see anything. He stood there on the stand and told you that when Mrs. Amanda.

Smith came out of that room, he didn't observe any bruises on her. That's what he told you.

No bruises on her whatsoever when she got out of that room. And he also told you he didn't see what happened in that room. He speculated because he heard a thump that somehow my client slung somebody down or did something or another, but he didn't see it. He did not see a thing. He told you that he didn't see anything. He stood on the stand and told you, he didn't see he didn't see any bruises on her. And he came back and told you that when he got back and looked at her while she was in the ambulance, he didn't see any bruises. He saw some swelling on her face, but he didn't see any bruises. RR5At68) like the kind you saw. And the DNA expert came up here and told you about the polymerase chain reaction of Kary Mullis. And she also told you that they found another (male's DNA) on the (items). Another male. Yet, they only tested two people, a female, Amanda Smith, they used that as their standard to show a DNA profile. And they tested Gary Mount. That was the DNA profile for him.

And they came back due to science and told you there was another male contributor. It was another man out there who that DNA belongs to, another man that the DNA belonged to

And she admitted on the stand that it's possible that Amanda Smith could have had sex with another man because there's another male's DNA <u>RR5 At 69</u>) out there ~~RRMU~~ <u>RR5 at 70</u>) And I think at the conclusion, when you sit down and you analyze all of the evidence <u>RR5 at 71</u>) that's been presented before you, you see that there are some inconsistencies. You see that there are some things out there that deserve some questioning. And you see that some of these testimonies from some of these people were not truthful.

Amanda said she didn't smoke any Kush. Gary Caskey said, yeah, I saw them smoking Kush. And he told you it was synthetic marijuana.

And he told you that they had been drinking vodka, but not Amanda Smith No, I didn't have any Kush. What else is she lying about? What else is she lying about?

~~STATEMENT OF FACTS~~
~~IN SUPPORT~~

# STATEMENT OF FACTS IN
# SURPORT OF CASE LAW
## Page :- (1 - 6)

STATEMENT OF FACTS IN SURPORT OF
CASES CITED:

Adams, 768 S.W. 2d 281, 293 [Tex. Crim. App. 1989]

Alcorta V. State of Texas, 355 U.S. 28. 78 S.CT. 103,
2L. Ed. 2d 9; United States ex rel-

Avery V. State of Georgia, 345 U.S. 559, 561. 73
S.CT. 891, 892. 97 L. Ed. 1244;

Ashcraft V. State of Tennessee, 322 U.S. 143, 149,
64 S.CT. 921, 923, 88 L. Ed. 1192;

Brady V. Maryland, 373 U.S. 83, 83 S.CT. 1194 (1963)

Bailey V. State of South Carolina, 289 U.S. 412, 420
.53 S.CT. 467 .670. 77 L. Ed. 1292.

Based On Brady V. Martcand, 373 U.S. 150 92
S.CT. 763, 31 l.ed. 20 .104 (1972)

Bagley V. United States, 473 U.S. 667, 681-82, 105
S.CT. 3375 87 L. Ed. 2d 481 (1995)

Chabot, 300 S.W. 3d 768 [Tex. Crim. App. 2009]

Carmona, 185 S.W. 3d 492 [Tex. Crim. App. 2006]

Cooper V. Aaron, 358 U.S. 1, 78 S.CT. 1401, 3 L. Ed. 2d 5

## STATEMENT OF FACTS IN SURPORT OF CASES CITED

State Cases:

Cassell V. State of Texas, 339 U.S. 282, 283. 70 S.CT. 629, 94 L.Ed. 839 (dissenting opinion)

Creswill V. Grand Lodge Knights of Pythias, 225 U.S. 246, 261, 32 S.CT. 882. 56 L.Ed. 1074.

Davis V. Wechsier, 263 U.S. 22, 24. 44 S.CT. 13, 14. 68 L.Ed. 143.

Feiner V. People of State of New York, 340 U.S. 315, 322, 323 - not. 4: 71 S.CT. 303, 307, 95 L.Ed. 267

Fierro, 934 S.W. 2d 370, 373 [Tex. Crim. App. 1996)

Giglio V. U.S., 405 U.S. 150, 31 L.Ed 2nd 104, 92 S.CT. 763

Ghahremani, 332 S.W. 3d 470 [Tex. Crim. App. 2011) LEXIS 330

Haley V. State of Ohio, 332 U.S. 596, 599. 68 S.CT. 302. 303. 92 L.Ed. 224;

Kem-Limerick, INC. V. Scurlock, 347 U.S. 110, 121, 74 S.CT. 403, 410, 98 L.Ed. 546.

Keeter V. State, 175 S.W. 3d 756. [Tex. Crim. App. 2005]

# STATEMENT OF FACTS IN SURPORT OF CASES
## CITED

**State Cases:**

Leyra v. Denno, 347 U.S. 556, 558, 74 S.CT. 716, 717. 98 L. Ed 948:

Mooney v. Holohan, 294 U.S. 103, 55 S.CT. 340, 79 L. Ed 791.

Mesarosh v. United States, 352 U.S. 1, 77 S.CT. 1, 1 L. Ed. 2d 1.

Martin v. Hunter's Lessee, 1 Wheat. 304, 4 L. Ed. 97:

Malinski v. People of State of New York, 324 U.S. 401, 404, 85 S.CT. 781. 783, 89 L. Ed. 1029.

Niemotko v. State of Maryland, 340 U.S. 268, 271, 71 S.CT. 325, 327, 95 L. Ed. 267.

Napue v. People of the State of Illinois, 360 U.S. 264 79 S.CT. 1173 3 L. Ed. 2d 1217.

Pyle v. State of Kansas, 317 U.S. 213, 63 S.CT. 177, 87 L. Ed. 214.

People v. Savvides, 1 N.Y. 2d 554, 557, 154 N.Y. S. 2d 885, 887. 136 N.E. 2d 853, 854-855.

Payne v. State of Arkansas, 356 U.S. 560, 562, 78 S.CT. 844, 847, 2 L. Ed. 2d 975:

# STATEMENT OF FACTS IN SURPORT OF CASES
## CITED

State Cases:

Ross V. State, 233 S.W. 2d 126,156 [Tex. Crim. App. 1950] Certiorari granted 71 S.CT 529, 340 U.S. 946, 95 L.Ed 682, reversed 71 S.CT. 742, 341 U.S. 918. 95 L.Ed. 1352.

Roth V. United States, 354 U.S. 476, 497. 77. S.CT, 1304, 1315 1 L.Ed 1498.

Smith V. State of Texas, 311 U.S. 128. 130, 61 S-CT. 164, 165. L.Ed. 84.

Stroble V. State of California, 343 U.S. 181, 190, 72 SCT .599, 603, 93 L.Ed. 872. (dissenting opinion).

Sterling V. Constantin, 287 U.S. 378. 398, 53 S. CT. 190. 195, 77 L. Ed. 375,

Southern Pacific Co, V. Schuyler, 227 U.S. 601, 611. 33 S.CT. 277. 280, 57 L.Ed 662.

Thomas V. State, 841 S.W. 2d 399, 404 (1992)

United States V. Bagley, 473 U.S. 667, 681-82, 105 S.CT. 3375 87 L.Ed. 2d 481 (1995)

Web V. State, 278 S.W. 2d 158, 161 [Tex. Crim. App. 1955]

Whitman V. Wilson, 318 U.S. 688, 63 S.CT. 840, 87 L.Ed 1083 and; White V. Ragen, 324 U.S. 760, 65 S. CT 978,

# STATEMENT OF FACTS IN SUPPORT OF CASES CITED

③

State
Cases:

89 L. Ed. 1348.

Ward V. State of Texas, 316 U.S. 547, 550. 62 S. CT. 1139, 1141, 86 L. Ed. 1663.

2 L. Ed 1575, 3 L. Ed 2d 1991

13 Ill. 2d 566, 571, 150 N.E. 2d 613, 616.

83 S-CT. 1194 (1963)

79 S. CT. 1173, 3 L. Ed. 2d 1217

Federal
Cases:

Almeida V. Baldi, 3.[rd] Cir., 195 F. 2d 815, 33 A.L.R. 2d 1407; United States ex rel.

Curran V. State of Delaware, 3rd. Cir; 259 F. 2d 707.

De Marco V. U.S., 928 F. 2D. 1074 (11th Cir. 1991)

Gonzalez-Soberal V. United States, 244 F. 3d 273 (1st Cir. 2001)

Guzman V. Secretary, Dept of Corrections, 663 F. 3D. 1336 (11th Cir. 2011)

Griffin V. Pierce, 622 F. 3D. 831. (7th Cir. 2010)

# STATEMENT OF FACTS IN SUPPORT OF CASES CITED

⑥

Federal
Cases:

Jones V. Commonwealth of Kentucky, (6th Cir); 97 F.2d 355, 338, with in re Sawyer's Petition. (7th. Cir.; 229 F.2d 805, 809.

Montgomery V. Ragen, D.C., 86 F. Supp. 382 See generally annotation. 2.L.Ed. 2d 1575.

Moore V. Marr, 254 F.3D. 1235, 1241. (10th Cir. 2001)

Steinkuehler V. Megchner, 176 F.3d. 441, 445 (8th. Cir. 1999)

Thompson V. Dye, 3rd. Cir., 221 F.2d 763; United States ex rel.

United States V. Tucker, 716 F.2D. 576, 585, 587. (9th Cir. 1983)

United States V. Webster, 392 F.3d 787, 801. (5th Cir. 2004)

Van Liew V. U.S., 321 F.2d 674 (Tex.) 1963)

# SUMMARY OF THE ARGUMENT
## Page: 1-4

# ARGUMENT
## Page: 1-14

# SUMMARY OF THE CASES
## Page: 1-6

# EVIDENCE
## Page: 1-61

# PRAYER
## Page: (1)

# CERTIFICATE OF SERVICES
## Page: (1)

① 

State failed To correct Perjured Testimony which tainted-influenced The minds of the jurors, and did Contributate to the defendants conviction and sentence and prejudice the defendant from geting a fair and impartial trial.

It is established that a conviction obtained through use of false evidence, known to be such by representatives of the state, must fall under the (14) Fourteenth Amendment. The same result obtains when the State, Although not soliciting false evidence, Allows it to go uncorrected when it appears, The priciple that a State may not knowingly use false evidence, Including false testimony, To obtain a tainted conviction, Implicit in any concept of Ordered Liberty, Does not cease to apply merely because the false testimony goes only to the credibility of the witness, The jurys estimate of the truthfulness and reliability of a Given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant Life or liberty may depend. Petitioner was denied due process of law in



Violation of the Fourteenth Amendment to the Federal Constitution because important witnesses for the State in a Aggravated Kidnapping charge, Plus a Aggravated Sexual Assault charge of the Petitioner falsely testified.

Const. Law Conviction obtained through use of false testimony, known to be such by representatives of the State, is a denial of due process, and there is also a denial of due process, when the State, though not soliciting false evidence, allows it to go uncorrected when it appears. U.S.C.A. Const. Amend 14.

Const. Law Principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. U.S.C.A. Const. Amend 14.

Const. Law Assistant State's Attorney did nothing to correct false testimony of witness, fact that jury was apprised of other grounds for believing that witness may have had an interest in testifying against petitioner did not turn what was otherwise a tainted trial into a fair one. U.S.C.A. Const. Amend 14.

Const. Law    Assistant State's Attorney did nothing to correct false testimony of witness, petitioner was denied due process of law.

Federal Courts    The United States Supreme Court has the duty to make its own independent examination of the record to determine facts when federal constitutional deprivation are alleged.

Federal Courts    In cases in which there is a claim of denial of rights under the Federal Constitution, the United States Supreme Court is not bound by factual conclusions of lower courts, but will re-examine the evidentiary basis on which those conclusions are founded

The question presented is whether on these facts the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

First, it is established that a conviction obtained through use of false evidence, ~~was~~ known to be such by representatives of the State, must fall under the Fourteenth Amendment.

# SUMMARY OF THE ARGUMENT

④

The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

# ARGUMENT

Pages:

(1-14)

State Failed To Correct Perjured Testimony which Tainted-Influenced The minds of the Jurors

(ARGUMENT)

Napue V. Illinois, 79 S. Ct 1173 At: 1177 made clear "It is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the (14) Fourteenth Amendment. The same result obtains when the State, Although not Soliciting False evidence, Allows it to go uncorrected when it appears. The principle that a State may not knowingly use false evidence, Including false testimony, To obtain a tainted conviction, Implicit in any Concept of Ordered Liberty, Does not cease to apply merely because the false testimony goes only to the Credibility of the Witness. The jury's estimate of the truthfulness and Reliability of a given witness may well be determinative of guilt or innocence, and it is upon such Subtle factors as the possible interest of the witness in testifying falsely that a defendants life or Liberty may depend.

Petitioner was denied due process of law in violation of the Fourteenth Amendment to the Federal Constitution because important witness for the State in a Aggravated kidnapping charge, plus a Agravated-Sexual Assault charge of petitioner falsely testified that petitioner had jump out the drivers door and ran into the forest behind his landlords house. But the Victim said that he climb over the Console in the truck over her lap and went out the passenger door, she then got under the Steering wheel and drove about 20 to 30 feet and thats when the police pulled her over, The Victim Stated you can not open her driver door from the inside or the outside it is jamled, Officer Anthony Glenn with the Harris County sheriff's office, Stated he was parked in front of Gary Caskey's house on 65 pine Street, Huffman, Texas he said it was dark outside. He Stated under Oath that he saw threw Gary Caskey's yard and threw the forest and threw a house trialer behind Gary Caskey's house that a dark large vehicle was going down Elm Street behind 65 pine street. He said he came up pine Street to main street, he took a left turn on main street and Came to Elm Street, he also took a left turn on Elm street

② He said he came up behind the vehicle that was parked in the road which he said it was steal dark outside and he said he had his headlights on but he could not tell you what color the vehicle was even through it was 8:00 am in the morning. He stated when he pulled up behind the vehicle That a white male jump out the drivers side door and ran into the forest with a white shirt and blue jean shorts on. He stated he walked up side of the vehicle with his shotgun because someone else was in the vehicle, he said there was a women seting in the passenger seat that look like she was beat up

---

Dec 3, 2014 Amanda Smith testified on the witness stand that we pulled up behind Gary Caskey's house on Elm street. That Gary Mount put the Surburban in Park and I climb over the console and over her lap in the passenger seat and went out the passenger side door and went into the forest behind Gary Caskey's house. She said she got under the steering wheel and drove off. She said she drove about 20 to 30 feet and the police came up behind her and put the lights on and pulled her over. She also stated that her driver door does not open on the driver side.

---

Deputy Anthony Glenn Stated In Transcript Volume 3 Page: 46 Line 16, and 17 I believe she had a small bump on her head. Page 47 Line 16 Like a little goose egg. Line 17 Did it look freash Line 18 Yes, sir. 9 Year old Girl

Go To Trial Transcript Volume (4) Part (2) James Thomas Dousay. He works for the Harris County Sheriffs office. I'm currently assigned to the Houston FBI Violent Crime Task Force. Page 208, Line 10 threw 12, then Line 16 threw Line 19, This officer states there is no Goose egg on her forehead as officer Anthony Glenn Stated (9 year old Girl)

③ Amanda Smith, testified that I took her to a secluded wooded area why she is blacked out and she said it was at the end of cherry Larual street Now how is she going to no this and she is black out But on the witness stand she said it was at the end of Holly Lane, She told in her Verbal Statement and Audio Statement taking by James Thomas Dousay the FBI Agent that I took her to the end of cherry. Larual street this is also stated in the police report, her verbal statement, her Audio Statement

Amanda Smith testified that she was not smoking kush on the night of Janary 18, 2013 aro drinking but Gary Caskey Said She was smoking kush that night and drinking Go to trial transcript Volume(3) Gary Caskey stated on the witness stand page. 136 Line 9 threw 10 then Line 11 threw 12 Go to page 20 of Volume 4 Gary States in Line 23 threw Line 25 Yes a Goose egg on her head. Page 39 Volume 4 Line 1 threw 17 Page 50 of Volume 4 Line 3 threw 11 Gary Caskey's states that Amanda Smith is drinking Vodka that She said in her testimony that she wasn't drinking Vodka that might

Page 50 of Volume 4 Gary Caskey also states in Line 12 threw 25 then page Amanda Smith and Gary Mount is Smoking synthetic marijuana and drinking Vodka why is she saying she wasn't smoking this when she testified under oath on the witness stand If all this is true then why is she cover stuff up that is true are hiding stuff from the Jury and the Judge look at all these Lie's and perjury testimony what are thay licing about Then what other Lie's did thay also tell Read all of Page 51,52,53,54,55,

④ Page 57 Line 23 threw 25 You also stated that when you saw Mr. Gary Mount leaving your residence the night of the incident, that he wasn't wearing any shirt; is Page 58 Line 1 that correct Line 2 Thats the way I remember it (This backs my claim up on the perjury testimony the Cop gave Anthony Glenn he said I had a white shirton and cut of Bluejean shorts) See: Page 64, 65, ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

Page 66 of Volume 4 Line 1 threw 25 Gary Castey said I got in the drivers door Amanda Smith says her driver door does not open ~~xxxxxxxxxxxxxxx~~. Gary Castey Said I was driving ~~xxxx~~ then on Page 66 Line 10 he says No he don't no who's driving.

Gary Castey says
Page 66 Volume 4 Line 22 threw 25 She was living in her surbuben her and the kids when she moved in with ~~you~~ him But Amanda Smith testified and Said She was never Living in her Vehicle prior to moving in with ~~xxxx~~ him.

Amand Smith testified on the witness stand that she had no sex with nobody from Jan 19, 2013 back to Jan 7, 2013 this is what the District Attorney asked her and my trial Lawyer asked her the same thing and she said no both times. Now the DNA Test shows that the test came back enconclusive Mix-matched had my DNA surposely in her and also another Male Seman in her also This is what the DNA Forensic Expert Chirsty Smejkal Testified too. (This was too ~~x~~ out the Transcript)

Now ~~Page~~ Sexual Assault nurse examiner stated that On Page 134 She asked Amanda Smith Line 2 threw Line 5, The Last question asked, when was the patient's most sexual recent—most recent sexual contact with a male up to one week prior to the assault. And she said she had none.

⑤ How is it that Amanda Smith and Gary Caskey called Officer Richard Jenkins back out to the crime scene later that afternoon and toll him that thay had more evidence to give him. Which Officer Jenkins testified that he found Amanda Smiths Black Parjarmers she wears around the house a t the foot of Gary Caskeys bed in his bedroom. Now these parjamers had my seman in the croch of them and thay had Amanda's blood on then now is this and the beating too place in her Green Surbubom and the Sexual Assault surpose of took place in the vehicle also so explain the blood on them and my Seman on them and thay was found aX Gary Caskeys foot of the bed Plus there was another male Seman and DNA found on them also. This proves that she wassleeping with Gary Mount as his Girlfriend which she lied about and she lied about me catching her and Gary Caskey having sex that night. Officer Jenkins stated and testified that he pick up a orange and black harley Davidson Blanket and a Black Blanket a blue shirt, Pink Shirt white shirt, yellow shirt gray Jacket, Leperod Blacket from the scene that afternoon when thay called him backout there, But the FBI Agent said he went back out there 2 days later when thay called him and pick all this evidence up.

# ARGUMENT

Now, I just want to point out to you some of the things that I've observed in this case. First of all, it was obvious that Amanda Smith had some sort of fall wherein she slipped on I don't know if it was a porch. I don't know if it was a ramp leading up to a porch or whatever because of the wetness. Now, I find it hard to believe that the only injury that she would have received from that fall is just on her elbow and no other parts of her body. And the elbow was dislocated, which would mean that that was a tremendous impact that she had, a dislocated elbow. I fall. I don't dislocate my elbow. She fell and she dislocated her elbow. She had to go to the doctor and have that splint put on her elbow. And the pictures that you saw there, some of them reflected the redness of her elbow even after even after sometime when it was in the healing process. You could see the redness in her elbow from some of the pictures that they had there. There was an allegation with regard to her elbow and the split that she was wearing that Mr. Gary Mount dragged her by the splint or used the splint some kind of way to abduct her. But of all those DNA tests that we got there, there was none of Gary Mount's DNA on that splint or any wrapping or bindings by him. Not one inkling. Not even when they used

# <u>ARGUMENT</u>

Kary Mullis' polymerase chain reaction which magnifies DNA to a greater level even when it's minutare. Still couldn't find any of his DNA on that wrapping with regard to her arm.

We don't know what injuries were caused by her fall. We don't know what injuries were caused by her fall. We don't know what injuries were caused by other activities that she had during that day or when these injuries occurred. Because the expert medical examiner found abrasions in her terms that were old. She found abrasions that were new. And she found abrasions that were healing. And she acknowledged that due to human variation differant people heal at differant times.

But she got to that hospital relatively quick from the time period that this alleged situation occurred, within hours. You know, you have to determine in your mind how much healing could have occurred and where those old wounds came from and where the in-between wounds came from and where the healing wounds came from. You have to sit down and think about that. I wanted to point to your attention about a situation where an officer came before you and said that there was some sort of a white T-shirt, that Gary Mount was wearing. And he said that because of the fact

# ARGUMENT

that there was dew on the ground and because it had gone into night and early morning, when they got out there because of the remote location, because the fact there was dew on the ground, the shirt had no dew on it, because of the fact that the dog hit on the shirt, he felt that the shirt belonged to Gary Mount.

However, in the testimony of both Amanda Smith, the alleged victim, as well as Gary Caskey, neither one of them could recall if Gary Mount was even wearing a shirt during that night. Not one. Amanda Smith could not say that Gary Mount was ever wearing a shirt that night and didn't know what color shirt he was wearing if he was wearing a shirt, neither could Gary Caskey who was not in a situation where he felt threatened. Obviously he wasn't. He stood supposedly in the room between them. So obviously he didn't feel too threatened by Mr. Gary Mount. I want to call your attention and it's your duty, as I told you, to look at the testimony of the officers and all of the people involved in this case and determine their credibility. So I'm not saying they're not credible or credible. That's your job to determine whether they're credible or not credible. Amanda Smith got on the witness stand and

# ARGUMENT

said that there is no way that she could ever enter into her vehicle from the driver's side because that driver's side door was jammed shut. And she testified that people were coming in and out of her car using the passenger side.

But the police officer Deputy Glenn that testified said that he distinctly saw Mr. Gary Mount come out of the driver's side and run into the woods. That's what he testified to under oath, sworn testimony. I'm not saying he's a bad police officer. I'm saying he's lying. I'm saying he forgot what happened that night. I'm saying that in his excitement of doing all those things and trying to perform his duties that he didn't quite get right. And if he didn't get that point right, is there some other point that he didn't get right also, too? If these two people, Gary Caskey and Amanda Smith, don't remember that there was a T-shirt that Gary Mount was wearing or whether or not he was wearing a T-shirt, did they leave out something else? Was there something else missing? Did they distort the facts in something else? Now, Gary Caskey admitted that he had been drinking vodka. He said he only had a couple or, two or three drinks, but we don't know how

many drinks he had. He could have been stone-cold drunk. Vodka is a pretty powerful drink. He had this vodka to drink and he told you a story about how he got all the way from the furthest northeastern corner of Harris County, Texas, up near the Huffman area, all the way to the very southwest part of Fort Bend County in an hour, an hour and a half and he made two stops along the way, a 15-minute stop and a 20-minute stop. And he got there in that time period. He couldn't tell you what route he traveled that night to get all the way from near Huffman northeast all the way to the southwest side over in Rosenburg, Texas. He told you he took 288. Now, some of you might be here from Houston, but I don't see how you're going to get there from 288. That seems like the longest cut that you could possibly take. Why? Because you're going all the way down to southeast, then you're coming all the way back around. Even no matter what traffic was, you just can't take 288 to get over there. It's not going to take you over to Rosenberg. 59 might, you know, somewhere in that mind, but not 288. I don't think Mr. Caskey was trying to deceive you. That's not what I'm presenting to you. I'm saying he's an elderly man. He's little bit confused about the facts.

# ARGUMENT

And here's the thing, he didn't see anything. He stood there on the stand and told you that when Mrs. Amanda Smith came out of that room, he didn't observe any bruises on her. That's what he told you. No bruises on her whatsoever whe she got out of that room. And he also told you he didn't see what happened in that room. He speculated because he heard a thump that somehow Gary Mount slung somebody down or did something or another, but he didn't see it. He did not see ~~anything~~ a~~ny~~thing. He told you that he didn't see anything. He stood on the stand and told you, he didn't see he didn't see any bruises on her. And he came back and told you that when he got back and looked at her while she was in the ambulance, he didn't see any bruises. He saw some swelling on her face, but he didn't see any bruises like the kind you saw. He also testified that when she fell off the porch that he truthful did not know how many injuries she had and what the extent of her ~~xxxx~~ injury was when she fell off the porch and what her body looked like because he'd never seen her without her clothes on and he'd never seen her in a situation where he could have seen and observed all the injuries that she had

occurred as a result of the fall that she had.

And the DNA expert came up here and told you about the polymerase chain reaction of Kary Mullis. And she also told you that they found another male's DNA on the items. Another male. Yet, they only tested two people, a female, Amanda Smith, they used that as their standard to show a DNA profile. And they tested Gary Mount. That was the DNA profile for him. And they came back due to science and told you there was another male contributor. It was another man out there who that DNA belongs to, another man that DNA belonged to. And she admitted on the stand that it's possible that Amanda Smith could have had sex with another man because there's another male's DNA out there that was found on all the Items and inside of her varginal. Amanda Smith got on the witness stand and told you that she didn't remember anything that happened inside the bedroom. She didn't remember anything that happened outside of the household when allegedly the two people got into her vehicle. She said she blacked out and she passed out and she did not remember anything that occurred when they allegedly got inside their vehicle. Not a thing. She was blacked

out the whole time. It might have been the (Kush (aka synthetic marijuana) that she was smoking. It might have been the vodka. It might have been the combination of both and her mental medication. We don't know. She was high. And she's had sex with another man because the DNA profile shows another male was out there. Amanda Smith was basically told by other people what happened to her. She didn't tell you from what she experienced, because she was blacked out half the time. She told you from what she heard other people say. That was her testimony. What she heard other people tell her and put in her brain that happened. That's where she got her information from. (Look at RR4, At 161) Line 1 thru 20)

What I want you to sit down and determine is whether or not there is a doubt that Gary Mount did this, since nobody saw what happened. That's what I want you to sit down and make a determination about. And there's somebody else's DNA out there who was not tested. We don't know if that was Gary Caskey's DNA. We don't know whose DNA that was. But another male was out there. And another male had interaction with her. We know that for sure, Okay.

# ARGUMENT

And I think at the conclusion, when you sit down and you analyze all the evidence that's been presented before you, you see that there are a lot of inconsistencies, perjury testimony's, and Insufficient Evidence. You see that there are somethings out there that deserve some questioning. And you see that some of these testimonies from some of these people were not truthful.

Amanda said she didn't smoke any Kush. Gary Caskey said, yeah, I saw them smoking Kush. And he told you it was synthetic marijuana. And he told you that they had been drinking vodka, but not Amanda Smith. No, I didn't have any Kush. What else is she lying about? What else is she lying about?

# Summary of the Cases

Pages: ~~████ ████~~ ~~████~~ (1-4)

(Napue V. Illinois, 79 S.CT 1173 at: 1177) made clear "It is established that a conviction obtained through use of false evidence, Known to be such by representatives of the State, must fall under the (14) Fourteenth Amendment. The same result obtains when the state, Although not soliciting false evidence, allows it to go uncorrected when it appears. The principle that a State may not Knowingly use false evidence, Including false testimony, To obtain a tainted conviction, Implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jurys estimate of the truthfulness and reliability of a Given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendants life or liberty may depend.

(Brady V. Maryland, 373 U.S. 83, 87, 83 S.CT 1194, 10 L Ed. 2d 215 (1963) (Due process is violated when the State refuses to disclose requested evidence that is favorable to the defendant regarding either punishment or guilt); (United States V. Bagley, 473 U.S. 667, 681-82, 105 S.CT. 3375 87 L.Ed. 2d 481 (1985) (Due process requires reversal if the State

regardless of whether the defense made a request, failed to disclose relevant, mitigating evidence to the defendant.)

(Ex Parte GHAHREMANI, 332 S.W. 3d 470. (Tex. Crim. App. 2011.) Lexis 330:) (The court ordered these application be filed and set for submission to determine whether the state violated Brady when it failed to turn over offense reports and e-mails, Audio Statements, DNA Reports, Verbal Statements, Police reports, located in the state's work-product folder and, if so, whether the violation created a reasonable probability that, had the evidence been disclosed to the defense, the results would have been diffrant as to the punishment. The due process clause of the Fourteenth Amendment is violated where the state knowingly uses perjured testimony to obtain a conviction. If a defendant is able to establish both that the State knowingly used perjured testimony and that it failed to disclose evidence showing the falsity of that testimony, the defendant is entitled to relief

(De Marco v. U.S., 928 F. 2D. 1074 (11th Cir (1991) (... a conviction must be overturned which rest in part upon the knowing use of false testmony if

there is any reasonable likely hood that the false testimony could have affected the judgement of the judge. And the defendants conviction and sentence where it most likely prejudice the defendant.)

(Guzman v. Secretary, Dept. Of Corrections, 663 F.3D (11th Cir. 2011)(. Prosecutor Misconduct, knowingly used perjured Testimony.)

(Based on Brady v. Martcand, 373 U.S. 150 92 S.CT. 763, 31 1. ed 2D 104 (1972).( Requires Proof that (1) Prosecutor knowingly used testimony or failed to correct what he subsequently learned was false testimony and (2) Such use was material, That there is any likelyhood that the false testimony could have affected the judgment. (Earily recant of, verbal statement, Audio Statement, police report, Giving to the D.A. Mr. Wakefield, knew about the evidence and withheld it from trial and defense tho D. A. withheld evidence).

(Grittin v. ~~Pierce~~ Pierce, 622 F.3D. 831 (7th Cir. 2010)... State knowingly used perjured testimony.

(Robinson v. Mills, 592 F.3D. 730 (6th Cir. 2010) ... the state, in violation of (Brady v. Maryland, 373

U.S. 83, 83 S.CT. 1194, 10 L.ED. 2D. 215 (1963) withheld impeachment evidence that would likely have altered the outcome of the case; here the District Attorney suppressed impeachment evidence. [police report, Verbal Statement, Audio Statement, DNA Reports, Photo's] was material under Brady.

( Violation of Due Process )

(Giglio V. U.S., 405 U.S. 150, 31 L Ed 2nd 104, 92 S.CT. 763...... (The Nondisclosure if this evidence affecting the victim or witnesses credibility violated due process and justified a new trial; Irrespective of the Governments good faith or bad faith ..... Conviction on testimony known to prosecution to be perjured as denial of due process. 2 L Ed 2d 1575, 3 L Ed 2d 1991; .. withholding or suppression of evidence by prosecution in criminal case as vitiating conviction .. When the reliability of a given witness may well be determinative of guilt or innocence, The Prosecution's Nondisclosure if evidence affecting credibility justifies a new trial, under the due process clause, irrespective of the of the prosecution's good faith or bad faith ..... Under the due process Clause, a new trial is required in a criminal case if false testimony introduced by the State

And allowed to go uncorrected when it appeared, could in any reasonble likely hood have affected the judgement....83 S. CT. 1194 (1963), Held that suppression of material evidence justifies a new trial "irrespective of Good faith or bad faith of the prosecution."... Moreover, whether the nondisclosure was a result of negligence or design, It is the responsibility of the prosecuter.... For these reasons. The Due process requirements enunciated in Napue v. Illnois and the other cases cited earlier require a new trial. and the judgment of conviction is therefore reversed and the case is remaned for further proceedings consistent with this opinion...

(Ex Parte Adams, 768 S.W. 2d 281, 293 [Tex. Crim. App. 1989])The State has an affirmative duty to disclose all material, exculpatory evidence to the defense under (Brady V. Maryland, 373 U.S, 83) (1963))Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results would have been diffrant.

(Van Liew V. U.S., 321 F.2d 674 (Tex.)1963) Since words asked and answered could not change

⑥

and nothing could be done to alter or improve governments case which reviewing court found insufficient, perjury cause was required to be remanded with directions to enter judgement of acquittal.

(Ex Parte Carmona, 185 S.W. 3d 492 (Tex. Crim. App. 2006) The applicant was adjudicated guilty of sexual Assault based entirely upon perjured testimony.

(Ex Parte Chabot, 300 S.W. 3d 768 (Tex. Crim. App 2009) The Court also agreed that it was more likely than not that Pabst's perjured testimony contributed to the Applicants conviction and punishment.

(Ex Parte Adams, 768 S.W. 2d 281, 293 (Tex. Crim. App. 1989) That the state Knowingly used perjured testimony to secure the applicant's conviction.

(Ex Parte Navid Ogheghaz Ghahreman, 332 S.W. 3d 470: 2011 (Tex. Crim. App. Lexis 330) The Court ordered these application be filed and set for submission to determine

Evidence Pg. (1~ 60)

① (Evidence) 1-61

Deputy ANTHONY GLENN
Aggravated Perjury
Testimony Under Oath
On The Witness Stand        Dec 1, 2014

Direct Examination By Mr. Wakefield

Perjury  In RR 3, at 30) Line 14) Deputy Glenn State's there
Rebute   is no streetlights. There is a street light
         in Gary Caskey's yard. There is a Streetlight
         at the Boat ramp just down the street and
         there is other streetlights also.

Perjury  In RR 3, at 46) Line 16 thru 17) Deputy Glenn Stated
         I believe she had a small bump on her head.
         In RR 3, at 47) Line 13 thru 18) District Attorney ask
         Deputy Glenn, What I want to ask you, you
         said there was a bump on her head. Explain
         what that bump looked like. Like a little
         goose egg. Did it look freash? Yes, Sir.

Rebute   In RR 4 at 208) Line 4) District Attorney ask
         James Dousay on Dec 3, 2014, When you saw
         Kaley Smith, did she have any injuries to her
         face? In RR 4 at 208) Line 10 ~~~~~~ FBI Agent
         I did not notice any on her face. ~~~~~

Rebute   In RR 4, at 208) Line 16 thru 19) District Attorney ask
         FBI Agent, Did you see any kind of lump to the
         back of her head? I did not. She had hair
         covering that area.

②

In RR3, at 47) Line 24 thru 25) District Attorney Ask Deputy Glenn, After talking to Gary and talking to Hayley, did you go outside and inspect the dirt area RR3, at 48) Line 1 thru 3 nearby the entryway and exit way of the house? Yes, I did. Okay. Tell the jury what you found there.

Perjury   In RR3, at 48) Line 4 thru 6) Deputy Glenn, I found what appeared to be drag marks where it looked like a person had been drug out toward the fence, toward the driveway.

Rebute   In RR8, at State's Exhibit (5), (6), (7), (8) It doe's not show any drag marks at all, If you will look real close on the ground the dark colar stuff on the ground is pine straw, leaves and debri out of the trees around there that has falling to the ground.

Perjury   In RR3, at 53) Line 14 thru 16) Deputy Glenn Stated Due to it being nighttime or dark hours, we were able to see the top-mount taillight on the Suburban.

Rebute   In RR3, at 77) Line 4 thru 7) Shortly after 6:30 a.m. I believe it was about 6:30, 7:00 a.m. Sgt. Halm got there Sgt. Halm got to 65 pine street  James Dousey got to 65 pine street at 7:00 am

③

Rebute In RR4, at 198) Line 24 thru 25) District Attorney Ask James Thomas Dousay. FBI Agent Rebute investigater for Harris County shrieff's Department. All right. And then what time Rebute did you get to 65 Pine? In RR4, at 199) Line 1 thru 2) I think I was at the scene just after 7:00 a.m.

In RR3, at 53) Line 17 thru 25) All right. And what did you do next? I was instructed by my sergeant to go and just check what vehicle that was. Okay. So where did you go from there? I went this direction to Main, around the block to Elm. All right.

In RR3, at 54) Line 2 thru 6) District Attorney What are we looking at? That's Elm Street. All right. Now in particulor picture, I'm not seeing any houses like we do see on the other Perjury street. Is that accurate on what that is? Yes, sir.

Rebute In RR3, at 81) Line 4 thru 7) Sgt. Joe Halm stated But there's houses behind on the next street over, so there's opening areas in some places and some places you can't see at all through it.

④

Perjury (In RR3, at 54) Line 7 thru 9) District Attorney ask Deputy Glenn, Now, at night are there any lights that are illuminating this forest?
Perjury Deputy Glenn Say's No, sir. There is houses all up and down this road that keeps there pouch lights on and thay have street lights. Read In RR3, at 81) Line 4 thru 7)

D-A & Deputy Glenn Testimony

Perjury In RR3, at 54) Line 15 thru 21) District Attorney Ask Deputy Glenn, All right. When you approached
Perjury on Elm Street -- first of all, describ the car that you approached on Elm Street? It was an older model Suburban. What color was it? Do you ~~remember~~ remember? I just remember
Perjury it was a dark-colored Suburban. In RR3, at 55) Line 1 thru 25) Okay. Was it driving down one side or the other side of the street? It was on the right side. All right. When you
Perjury approached the car, did you have your emergency lights on? I did. What about your siren? No siren. Okay. Now, as you approached the car, what's the first thing you see come out of that car? I saw a male
Perjury exit the vehicle and run into the woods. When you saw him exit the vehicle, did he exit from the passenger side or the driver's
Perjury side? Driver's side. All right. Did he leave the driver's side open when he exited the

⑤

District Attorney
Deputy Glenn

Perjury vehicle? Yes. With your finger, draw please for me the direction he ran? (Witness complies). Okay. Now, when you saw him running, what was he wearing? It appeared to be blue shorts and a white shirt. In RR 3, at 54) Line 1 thru 25) Is that description important to you? Yes. Why? That's the description I called out over the radio, when I said I saw a male running. Okay. Now, did you see that male again that day? Yes. Do you see that male in court today? Yes, sir. Would you please identify him and-- point to him and identify him by what he's wearing today. Gary. He's wearing the gray suit, brown tie. Your Honor, may the record reflect the indentification? The record will reflect that the witness has identified the defendant. Now, when you saw him run from that car, Okay, did he look at you as he was running? I don't recall. How fast was he going? He was doing a good clip. When he ran off into that forest, were you In RR 3, at 57) Line 1 thru 25) able to follow him? I did not follow him. Why? I could still tell there was an occupant in the vehicle, so I approached the vehicle first. When you saw the occupant in the vehicle, where was it, in the passenger side or the driver's side? The passenger side. All right. Now, when you approached the vehicle, were you armed?

(6)

District Attorney
Deputy Glenn

Perjury Yes, sir. What were you carrying? I was carrying a shotgun. Okay. So you approached the vehicle, all right. Was the driver's side

Perjury door still open? Yes, sir. Was the engine running? Yes, sir. Okay. And when you approached the vehicle, tell jury what you see. I saw a

Perjury female inside, huddled on the passenger side. She was cradling, like, her arms. Her arms were, like, held up against her body. She

Perjury was crying. She was shivering. She appeared to have In RR 3, at 58) Line 1 thru 7) been assaulted. And all she -- she was just saying

Perjury that she just wants to go home. Now, when you say she appeared to be assaulted, did you see injuries on her? Did the bruising appear to you to be fresh? Yes, sir.

Rebute

District Attorney
Amanda Smith's Testimony
To Prove Deputy Glenn
Committed Aggravated Perjury
Under Sworn Oath

Rebute In RR 4 at 176) Line 14 thru 25) And when he
Rebute drove you, do you remember him driving you
Rebute back towards River Chase -- I'm sorry -- River Terrace? Yes. Was he saying anything to you as you were driving? No. Were you saying

⑦

anything to him? NO. And when you got to River Terrace, did you guys turn down Pine Street? Yes. In RR 4, at 177) Line 1 thru 25) Was it Pine Street or was it the street right north of Pine? Mr. HAYNES: Your Honor, I object to that as being asked and answered. She said that it was Pine Street. The Court: Sustained. Mr. WAKEFIELD) When you turned into River Terrace, do you remember seeing any police there, when you first got there? I don't quite remember. When you turned into River Terrace, what happened next? We turned on Elm Street. Elm Street, I'm sorry. Let me show you State's 18, all right. When he turned on Elm Street, do you know why he had done that at the time he turned? Yes. Yes. Did he tell you why? I remember why now. What happened? Because we had seen the police. Okay. Did he say anything when he saw the police? I don't remember. In RR 4 at 178) Line 1 thru 25) All right. Now, after he turned down Elm Street, what did Gary do next? He jumped out of the vehicle around here (indicating). Can you circle it? Try to push down. (Witness Complies.) Okay. Right around there. All right. And when he jumped out of the vehicle, did he jumped out using the driver's door? I— Or do you remember? I don't remember. I

Rebute
Rebute
Rebute
Rebute
Rebute
Rebute
Rebute
Rebute
Rebute
Rebute

Rebut think he jumped over me or something. Okay. After he ran off, do you know which direction he ran? Yes, sir. Which direction was that? Back towards the house. All right. Rebute And when he ran back towards the house, what did you do? I jumped in the driver's seat. Okay. And when you jumped in the driver's seat, did you stop the car? I think I drove Rebute so many feet really quickly until I saw the headlights -- police lights In RR4 at 179)Line1 thru6) behind me. And then you stopped the car? Yes, sir. When you stopped the car, do you remember the officer that came to your door? Yes, sir.

Rebute In RR8, State's Exhibit(22) Page(4) History of Rebute Assault Page 4 At The Bottom of the Page Amanda Smith State's to Christian Owen, RN te (He brought me back to Elm Street. He jumped Rebute over me and out of the car and ran. I Rebute jumped in the drivers seat and hauled it, then I saw police lights and told them what happened)

Rebute In RR4, at 201)Line 3 thru 6) District Attorney ask FBI, Agent James Dousay, All right. When you first saw Amanda Smith, where was She? She was sitting in the drivers seat of



the Suburban? On Elm Street

Rebute In RR4 at 192) Line 7 thru 21) Mr. Haynes Ask
Rebute Amanda Smith, Okay. Now, that Suburban that
you have there, is it true that that front
driver's side door is jammed and doesn't
open? Yes. And how long had it been like
Rebute that? Not very long. I couldn't say. Is it
true that if someone wanted to enter and
exit the vehicle, thay had to enter and exit
Rebute the passenger side because of the front
door being jammed? Yes. There's no way
that anyone could have gotten in and out of
the driver's side door; is that correct?
Not through the door.

Open Statement by Mr. Wakefield
December 1, 2014
Inflametory, Aggravated Perjury
Prosecutional Misconduct

Perjury    In RR3, at 11), Line 16. D.A. Stated Amanda Smith
was living out of her car.

Rebute    In RR4, at 146), Line 2 thru 19 Amanda Smith State
that she was not living in her car as the D.A.
Stated only time she was living in her car
was after the incident on 1-19-2013.

Perjury    In R.R. 3, at 11), Line 23 thru 24. D.A. Stated that
Amanda Smith and her children would be in the
Front ~~Bedroom~~ room. Sleeping.

Rebute    In RR4, at 149), Line 4 thru 9. Amanda Smith
Stated her and her kids were staying in
the living room.

Rebute    In RR3, at 116), Line 6 thru 25; Then RR3, at 117)
Line 1 thru 6. Gary Caskey stated this is
the room I'm leting Gary Mount Stay in
Amanda only ~~she~~ selp in there when we
had sex ~~together.~~

Perjury    In RR3, at 11), Line 24 thru 25. D.A. Stated I
was living in the living room instead of
Amanda Smith. Living in the living room.

②

Perjury In RR3, at 14), Line 14 thru 21. D.A. States that Gary Mounts picks her up and drags her into the bedroom where Amanda Smith was staying and threw her against that wall so hard that it dented the wall with her body. Rebute (But Amanda said she never was staying in that bed room she was staying in the living room.) "Perjury"

Perjury In RR3, at 14) Line 24 thru 25. D.A. States Gary Mount then grabs victim by the neck Rebute like this, with one arm, Now at RR8, at State's Exhibit 82) 7.1 and 8.1 Gary Mount (K2) is excluded as the source of the DNA on these items. (L. Neck Swab / R. Neck Swab)
8.1          8.1

Perjury In RR3, at 15) Line 11 thru 16.) D.A. Said and he drags her outside of the house and throws her into a truck. That truck is actually going to be Amanda Smith's. And you will see photographs taken from the scene that show drag marks in the dirt in front of the house. that's where he dragged her all the way back Rebute to that car. Go To RR8, State's Exhibit 5,6 7,8. (It clearly shows no drag marks in this yard.)

③

~~In RR3, at 18) Line 5 thru 11) D.A.~~

Perjury   In RR3, at 18) Line 5 thru 11) D.A. stated and as I mentioned with DNA, that sexual assault exam will show the DNA. And the DNA is absolutely consistent with the defendant. And it's found in her vagina and also in her anus. ~~????~~

Rubute   In RR5, at 10) Christy Smejkal, Line 8 thru 11 Stated I'm a DNA analyst with the Harris County Institute of Forensic Sciences and The States Expert Wittness. States at

Rubute   RR5, at 22) Line 7 thru 14 My Seman was not the only one found as the D.A. said. Ms. Smejkal also states in RR.5, at 24) Line 11 thru 13 There was wasn't enough of DNA to

Rebute   Test. At RR.5, at 20) Line 17 thru 22) ~~????~~ ~~????~~ D.A. Let me ~~????~~ talk to you a little bit about the deposit of DNA on a person's body, all right. If I were to come up to you and put my hand on your neck and then put my hand away. and that neck was then swabbed for DNA, could that produce a mixture? Yes

④

Rebute   ~~RRR5ct~~ RR.4, at 247) Line 1 thru 25) Brittney Gonzalez
          stated that the perianal swab was
Perjury   negative for sperm. But Ms. Smejkal and
          the D.A. said it was positive for sperm
Rebute    but in RR.4 at 248) It clears all that
          up and its negative for sperm
          (Perjury By D.A. amd Aggravated
          Perjury by Ms. Smejkal and Prosecutional
          Misconduct)


⑫

Closing Statement by
Mr. Wakefield District Attorney


Perjury   In RR5, at 71), Mr. Wakefield stated in (Line 22 thru
          24 She was strangled. Strangled so bad that it
          burst the blood vessels in her eyes, so bad that
          she--the blood vessels in her chest exploded.
Rebute    In RR8, at States Exhibit 82) Page 2 of 5 The DNA
          results obtained from item (8-1 L.neck) swab are
          consistent with a mixture of DNA from at
          least two individuals. Amanda Smith (k1)
          cannot be excluded as a possible contributor
          to this mixture. There is insufficent information
          to determine whether Gary Mount (k2) is a
          contributor to this mixture. ~~perfect case~~
          ~~contributor to this mixture~~



Rebute   Also, RR8 at States Exhibit 82) Page 2 of 5 it also says The partial DNA results obtained from item 9-1 which is L-Hip Swabs Bite Mark are consistent with a mixture of DNA from at least two individuals. There is insufficient information to determine whether Amanda Smith (K1) or Gary Mount (K2) is a contributor to this mixture.

Rebute   In, RR8, at State Exhibit 82) Page 3 of 5 It states The DNA results obtained from item 10-1 L-Breast swab are consistent with a mixture of DNA from at least two individuals. Amanda Smith (K1) cannot be excluded as a possible contributor to this mixture. There is insufficient information to determine whether Gary Mount (K2) is a contributor to this mixture. At least one contributor to this mixture is male.

Rebute   In, RR8, at State's Exhibit 82) Page. 3 of 5 it says. The DNA results obtained from items (3-1 Oral swabs), (7-1 R. Neck Swab) (12-1 R. Fingernail Swab) (and 13-1. L-Fingernail Swab.) are consistent with the DNA results obtained from item K1. Therefore, Amanda Smith (K1) cannot be excluded as a possible source of the DNA on these items. Gary Mount (K2) is excluded as the source of the DNA of these items.

**Rebute** In, RR8, at states Exhibit 82) Page 3 of 5. Insufficient information was obtained from item (11-1) R. Breast Swab) for interpretation of the results.

**Perjury** In, RR5 at 72). Line 16 thru 19) the District Attorney stated this man has strangled her to the point where she has blacked out
**Rebute** multiple times. in States Exhibit 82-RR8 Page 2 of 5 and (page 3-of 5) 8-1 and 7-1 L-Neck Swab and R. Neck Swab doe's not have my DNA on her neck any where.

**Rebute** In, RR8 at State's Exhibit 82) Page 2 of 5. On 9-1 (L-Hip Swab Bite Mark) There is insufficient information to determine whether Amanda Smith (K5) or Gary Mount (K2) is a contributor to this mixture (There is DNA consistent with a mixture of at least two individuals

**Perjury** In, RR5 at 72) Line 23 thru 25) District attorney states again. And that Bite Mark was so important to me, because did you see where it was? Inches from her groin.
**Rebute** (L-Hip Swab 9-1) Negative for my DNA (K2)



Perjury In RR5 at 74) Line 10 thru 11) <u>District Attorney</u> States She was living out of her car. In, RR4 part 2) at 191 and 192) Line 24 ~~District~~ ~~States that~~ Mr. Haynes Defense Attorney

Rebute as k Amanda Smith. Is it true that Mr. Gary Caskey, when he found you, that you were living in your car in the (Page 192) RR4) Suburban. No, Sir. That is incorrect,

Perjury In RR5 at 75) Line 12 thru 17 District Attorney Used this as perjury testimony He said Gary Caskey says Gary Mount started becoming obsessive. He was trying to Call her ~~cell~~ phone over and over to try and get her on the phone, asking who is she with, what she's doing. ~~He Was~~ All you got to do is get a copy of the phone records from the phone Company my number

Rebute is 850-419-0700 for the Night of 1-18-2013 around 8:pm to 10:pm. To prove this is a lie He used

Perjury In RR5 at 78) Line 9 thru 11) District Attorney says, And there's this man, this man that apparently knows martial arts, much Stronger, attacking her mom(D.A. lied about this I do not no any Martial Arts what so ever at all.)



Perjury At, RR5, at 78) Line 15 thru 20) the District
Attorney Lied about this I did not hit
that girl and there was no goose egg

Rubute on her head In RR4 at 196) James
Thomas Dousay. Said I work for the
Harris County Sheriffs office. In RR4 at
196) He also say's he is asigned to
the Houston FBI Violent Crime Task Force.

Rebute In RR4 at 208) Line 4 thru 19) when you saw
Kaley Smith the 9 year old did she have any
injuries to her face? I did not notice
any on her face.

Perjury In, RR5, at 78) Line 15 thru 20. District Attorney
states that. He hits her. It doesn't matter
who she is. It doesn't matter how old she
is or that she's a girl. No one will get
in my way at this point. And so he
strikes that little girl so hard that she

Rebute has a goose egg on her head. You heard
Mr. James Thomas Dousay FBI Agent up
above about the goose egg not on her
face.

Perjury In, RR 5, at 78) Line 23 thru 25 District
Attorney states. And he begins to drag her
out. And that's what made those marts

Rebute on the ground RR 5, at 79) Line 1 thru 8



**Perjury** District Attorney states I'll agree with you, the dirt is all kinds of dirty. It could be anything. You're right. But it's awfully consistent when you see that the exact same pathway he took to drag that little girl--to drag Amanda Smith to that gate, that's where those little drag marks **Rebute** are found. (State's Exhibit 5, 6, 7, and 8 doe's not show no drag Marks.

**Perjury** In RR5 at 82) Line 20 thru 25) Then District Attorney stated. those are dirty clothes-they'd been around for a long time. Now in **Rebute** RR4 at 158, Part 2 of Two) Line 8 thru 18) Amanda Smith Stated I was wearing a big T-shirt and pajama pants She also stated that most all of my clothes I think were washed allready.

**Perjury** In RR5, at 82) Line 22 thru 25) District Attorney stated there ~~asexua~~ was no mixture here. This is your biggest part of the evidence. This is literally the nail that closes the coffin. There is only one man who was actually had DNA on RR5, at 83) Line 1) her anus and her vagina. He's sitting right there. **Rebute** In RR4 at 247) Line 1 thru 25) Brittney



**Rebute** Gonzalez stated that the perianal swab was negative for sperm. But Ms. Smejkal
**Perjury** and the District Attorney said it was
**Rebute** positive for sperm but in RR4, at 248) It clears all that up and its negative for sperm.

**Rebute** RR5, at 36) Line 19 thru 25) Okay; 15A-2 sperm. This 15 are the gray sweatpants. All right. The
*I was having sex with her these gray sweat pants to prove it and she lied about it* sperm fraction came back to be a mixture of three people. Now, explain to the jury how that's possible. (This is the District Attorney's Direct Examination of Christy Smejkal.)
RR5, at 37) Line 1 thru 4) Well, Okay, so I also put that Amanda Smith and Gary Mount could not be excluded. So Amanda Smith and Gary Mount are there. <u>And then there is another individual.</u>

**Rebute** In RR4, at 182) Line 10 thru 25) District Attorney Direct Examination of Amanda Smith. ~~Okay~~ Now, when you were in the ambulance, do you remember what you were wearing? <u>Just a T-shirt.</u> Okay. Did you have--when -- after Gary had bailed out, did he allow you to put on any underpants? No, sir. Did he allow you to put any pants on? ~~Did he allow you~~ Did he allow you to put on any pants at all? No, sir.

were you naked from the waist down when the EMTs got to you? ~~was you.~~

In RR4, at 183) Line 1 thru 20) Yes, sir. All right. And when you were at the location, were you able to get someone to get you some gray sweatpants to put on? Yes, sir. All right. So that when you went to the hospital, you could wear them? Yes.

The gray sweatpants was taking out the house after the kidnapping and sexual Assault had took place and we had returned to the location. The black and orange blanket came off my bed in the first bedroom. The gray pants had my seman in the crouch and some other male ~~DNA~~ also So this proves Amanda lie'd about having sex with me and Gary Caskey before the incedent took place the ~~Blue~~ Gray sweatpants and the Black pajama's proves this because both pair of pants was in the house when I surpose to put her in the vehicle and took her to the woods and to the bridge and surpose to have rape'd her that night.

In RR5, at 40) Line 22 thru 25) Christy Smejkal also state's that. Okay. the rest of the items, I

Rebute In. RR.5, at 40) Line 22 thru 25) was not able to do statistics on, but 18A-2 and 18 is actually the blue shirt. The sperm fraction, it was just a partial DNA profile. I didn't even get a full

Rebute In. RR.5, at 41) Line 1 thru 4) profile. It wasn't a mixture. And there was insufficient information to determine whether Gary Mount was a contributor. And then Amanda

Perjury Smith was excluded. (How is that and she
Rebute was wearing it.) Plus Amanda Smith stated
that she had on a white T-shirt in the
RR-5, at 182) Line 12
Ambulance that morning. Where did the
blue shirt come from. She had to change
shirts before she got to the hospital. From
a white T-shirt, to a blue shirt

Rebute In RR.5, at 46) Line 20 thru 25) Mr. Haynes Cross-examination of Christy Smejkal. I understand. Now, let's go on down to -- let's see. That means when you get down to, let's see, one, two, three, four, five, six, seven, eight. Paragraph (8) there. You have that paragraph there that says there is insufficient information to determine whether Gary Mount is a contributor to RR5, at 47) Line 1 thru 19) these mixtures, right? Are you talking about Item 8-1? I'm talking about eight paragraphs -- I'm going eight paragraphs down on Page 2, eight paragraphs down. (STate's Exhibits 82) Page 2



Rebut <u>Oh</u>, I apologize. <u>Yeah. I got it. So, yes, that's exactly</u>--that's exactly what it said, <u>insufficient information. And if we go to your coding system, it says that's a fraction of 2A-1, correct? Yes. 2A-1 is vaginal swabs, correct? Yes. And your analysis is saying that there is insufficient information to determine whether Gary Mount is a contributor, which means</u>--from what you're saying is that the sample might have been so low that even with PCR, you weren't comfortable in saying that it was his? <u>Regarding the major contributor, Yes.</u>

Rebut In RR.5 at 48) Line 4 thru 19) Okay. ▓▓. Next I'm going to the supplemental report. Okay. Okay. I'm still counting paragraphs. Let's start up here at the beginning on Page 2, the first paragraph, ~~▓▓▓▓▓▓▓▓▓▓~~ second paragraph, third paragraph, fouth paragraph. It says here: Amanda Smith cannot be excluded as a possible source of DNA on these items. Gary Mount is excluded as the source of DNA on these items. And that item is 17A-2. 17A-2 according to your code is? It's the white and pink shirt. White and pink shirt, okay. So that means that his DNA was not found on the white and pink shirt, Gary Mounts, correct? Correct.

① December 3, 2014

Amanda Smiths
Aggravated Perjury
Testimony Under Oath
On The Witness Stand
Direct Examination By Mr. Wakefield

Perjury In RR 4, at 150 Part 2) Amanda Smith Lie'd about what color her Suburban was, (she said It was a blue Nineties, early Nineties model.)

Rebute Now In, RR 3 at 80) Line 4 thru 5) Sgt. Joe Halm had been told that the supect and the Complainant had left in a green Suburban.

Rubute In RR 3, at 123) Line 9. Gary Caskey State's also that its a Green Suburban.

Rubute In RR.3, at 200) Line 16 thru 17) FBI Agent State's that its also a Green Suburban.

Perjury In RR 3 at 156) Line 1 thru 11 Amand Smith was asked by the District Attorney had she had any synthetic marijuana to smoke that night and She said NO.

Rebute In RR 4, at 50) Line 1 thru 25) Gary Caskey states when my Lawyer is Cross-Examination of him states that Amanda Smith was Smoking (Kush) synthetic marijuana and drinking Vodka But Amanda Stated early that she didnt drink nothen or smoke nothing when we got back from Rosharon, Texas

In RR4 at 155) Line 14 thru 16) Amanda Smith was asked by the D.A. Did the three of you have some vodka together? Amanda Smith said No, sir, not together. (Perjury)

② Rebute And In RR4 at 52) Line 1 thru 25 Gary Caskey States that we are drinking and smoking Kush and under the influence. But Not Amanda she lie'd about it to the <u>D.A, the Judge, the Jury,</u> and <u>My Lawyer</u> and committed Aggravated Perjury under oath.

~~In RR4 at 231) Line 1 thru 17) the District Attorney swears Brittney Gonzalez in as a witness for the State She used to work at the Harris County Institute of Forensic Sciences. She is a seventh Grade science teacher at the time of trial. Ms. Gonzalez States In RR~~

In RR4, at 69) Line 1 thru 13) District Attorney swears Christian Paige Owen. A Forensic Nurse Examiner For Memorial Herman. Perjury She States in RR4, at 89) Line 6 thru 9) this is what Amanda Smith says. I remember blacking out. He was choking me while he was doing that. His hands were around the neck. I kept blacking out because I couldn't breathe. ~~Debbie Caskey says~~

Rebute Now In, State's Exhibit 82) Page 2 of 5

③

Rebute    The DNA result obtained from item 8-1 are consistent with a mixture of DNA from at least two individuals. Amanda Smith (K1) cannot be excluded as a possible contributor to this mixture. There is insufficient information to determine whether Gary Mount (K2) is a contributor to this mixture. (L. Neck Swab) Item 8-1

Rebute    The DNA results obtained from Item 10-1 (L. Breast Swab) are consistent with a mixture of DNA from at least two individuals. Amanda Smith (K1) cannot be excluded as a possible contributor to this mixture. There is insufficient information to determine whether Gary Mount (K2) is a contributor to this mixture. At least one contributor to this mixture is male.

Rebute    The DNA results obtained from Items (3-1, Oral Swabs) (7-1 R. Neck Swab), (12-1 R. Fingernails Swab), (13-1 L. Fingernails Swab are consistent with the DNA results obtained from item (K1). Therefore, Amanda Smith (K1) cannot be excluded as a possible source of the DNA on these items. Gary Mount (K2) is excluded as the source of the DNA on these items.

④

Perjury  In RR4, at 89) Line 13 thru 15.) Christian Owen testified that Amanda Smith told her this on the morning when she preform the rape Exam. He was grabbing me on my arms. I had dislocated my right elbow a few days ago. He used that arm to subdue me.

Rebute  Now In, RR8, at States Exhibit 81) <u>Page 3 of 8</u> The DNA results obtained from (Item <u>14 B1- Fiberglass splint right Arm</u>) are consistent with a mixture of DNA from at least two individuals. The DNA results of the major contributor to this mixture are consistent with the DNA results obtained from Item (k1) Therefore, Amanda Smith (k1) cannot be excluded as a possible major contributor to this mixture. <u>Gary Mount (k2) is excluded as a contributor to this mixture.</u> (At least one contributor to this mixture is male.

Rebute  In RR8, at States Exhibit 81) 3 of 8) The DNA results obtained from (Item <u>16A1 Ace wrap</u>) are consistent with a mixture of DNA from at least two individuals. The DNA results of the major contributor to this mixture are consistent with the DNA results obtained from item (k1). Therefore, Amanda Smith (k1) cannot be excluded as a possible major contributor to this mixture

⑤

**Rebute** <u>There is insufficient information to determine whether Gary Mount (K2) is a contributor to this mixture.</u> (At least one contributor to this mixture is male.)

**Perjury** In RR4, at 134) Line 2 thru 5) The last question asked by Christian Owen to Amanda Smith was. (When was the patient's most sexual recent -- most recent sexual contact with a male up to one week prior to the assault. And she said She had none. ~~Now In RR5 at thus 1~~

**Rebute** Now In, RR5, at 22) Line 1 thru 17) Christy Smejkal testified and said the vaginal swab came back with a mixture of two individuals. The DNA Test results also came back Mix-matched @ enconclusive She had another male Seman in her vaginal along with mine. So she is lieing and committed Aggravated Perjury about its been over a week sense she ~~had contact~~ had sexual ~~@~~ Intercourse with a male

**Perjury** In, RR ~~000~~ 4, at 158) Line 6 thru 9) District Attorney ask Amanda Smith. When you were in the kitchen, do you remember what you were wearing?

(6)

Perjury  RR4, at 158) Line 6 thru 9) She stated I think I was wearing my pajama clothes, a big T-shirt and pajama pants probably.

Rebute  In RR4, at 85) ~~time~~ Christian Owen (aka Rape technition that preform'd the Rape kit states in Line 9 - Its a white shirt that she brought with her. And she stated that she cleaned her face with it.

Rebute  In RR4, at 85) Christian Owen states in Line 14 This is her blue shirt that she was wearing.

Now in, RR8) State's Exhibit/Sexual Assault Examination Forensic Report Form. It shows that the question was ask'd where if Amanda change cloths are not and the box was not checked

Perjury  (But she state that she was wearing a Big white T-shirt In RR4 at 158) in the house that night so how did she have a blue shirt on when she got to the hospital if she didn't change cloths. She stated she was wearing a white T-shirt also in the Ambulance seting in front of the house that morning

Perjury  In RR8, at State's Exhibit/Sexual Assault Examination Forensic Report Form. When was the patients most recent sexual contact with a male up to 1 week prior to the assault? Amanda Smith state'd None.

Perjury

In RR4, at 165) Line 25/ District Attorney Asks Amanda Smith, At any time before this, had you ever told RR4, at 166) Line 1) Gary that he could have sex with you that night. No

Rebute,

In RR4, at 223) Line 10 thru 25) Deputy Richard Jenkins States, We went into the residence and recovered a pair of pajama pants. <u>I asked her where her bottoms were</u>, because she was wrapped in a blanket. <u>And she told me they were in the bedroom</u>. Okay, District Attorney ask when you went to go pick these pajama pants up, did you have ø Idea if these were actually involved in the sexual abuse.-- No, or the kidnapping NO. They was in Gary Caskeys Bedroom at the foot of the bed

Perjury

In RR4, at 222) Part 2 of 2) Line 17 thru 25/District Attorney. Okay, "And did you ask her what had happened? Deputy Jenkins said Yes. What did she tell you? Deputy Jenkins, She told me that she was beaten and raped. Did she tell you where she'd been beaten and raped? Deputy Jenkins, Yes, Sir. It was two locations. One was a wooded area unknown. She said, some of it happened RR4, at 223/Line 1 thru 4 off of Holly. And the other one was a bridge at Casey Ridge is what she called it. Not at Gary Caskey's house where the pajamas was found by Deputy Jenkins in Gary Caskeys Bedroom. at the foot of his bed

The Sexual Assault was proved to of happened in a wooded area, and under a bridge The black pajama Pants was left at the house they was not in the vehicle, So if it was with Amanda Smith before, and with Amanda Smith having sex before hand with Amanda Smith how did my seman get in these pajama pants at the house

④

~~Difficult Questions All 250~~

Perjury

In RR4, at 167) Line 2 thru 4/ District Attorney ask Amand Smith, Earlier in the night, you were wearing pajamas. Do you know where those pajamas went? Amanda Smith State's No, Sir.

Rebute In RR4 at 223) Deputy Jenkins ask Amanda Smith. I asked her where her bottoms were, because she was wrapped in a blanket. And she told me they were in ~~Gary~~ Gary caskey's bedroom.

Rebute ~~When~~ In RR4, at 224) Read Line 1 thru 25 it explains the black pajama's was found at the foot of Gary Caskey's bed on the Floor by Deputy ~~Dekklan~~ Jenkins after the crime had allready happened

In RR4, at 225) Read 1 thru 25)

In RR4, at 226) Read Line 1 thru 25)

Perjury Amanda Smith stated she had no sex with any male in a week of the Rape kit exam but the test show'd My seman in her and another male seman also in her, she said she wasn't having sex with me before the incerdent. Explain how my DNA got in them

black pajama pants that was found at the foot of Gary Caskey's bed (aka Land lord) I stated in my statement That I caught her and my landlord having sex that night. Thats why I jump'd on both of them. I also had sex with Amanda on the couch that night of Jan 18, 2013 and the morning of Jan 18, 2013 But ever DNA Test That thay Did on her and all the Clothen it also had other Male DNA on them Gary Caskey Stated In RR.4,at 18) States

Rebute Exhibit NO. 20 Played for the Court and Jury Mr. Wakefield District Attorney asked Gary Caskey. What was she wreaing for her bottoms? Gary Caskey Stated Underwear. She didn't have any bottoms on when we left the house that night thats what thay said she had on black pants

Rebute I also ask you to lisson to all the Audio Statements giving by the witness'es, victim Defendant and the 9 year old girl Audio statement, it contactdicts all our statements. She states in her's that me and her mom is boy friend and girlfriend

Rubute In RR. 5 at 38 the sperm fraction of the pajama pants And this is consistent with two RR5 at 39)indivrduals

**⑩**

Perjury  In RR4 at 168. Amanda Smith states that I raped her on Holly street. But in fact this is not the street she said when she testified, She said it happened at the end of Cherry Laurel street and this is in the police report and in her Audio statement she gave that morning. And the verbal statement and police report

Perjury  In RR4 at 169) District Attorney ask Amanda Smith. You mentioned that he would choke you. Amanda Smith stated Yes. How would he choke you? With his hands around my neck. Okay. How many times did he do that? Three, Five, seven. I don't know This is what Amanda Smith said. Okay. D.A. And when he choked you like that, could you breath? Amanda Smith said No, sir. District Attorney Ask Did you ever lose consciousness when he did that? Amanda Smith said Yes, sir.

Rebute  In RR8, at States Exhibit 82 I'm excluded from the R. Neck Swab / L. Neck Swab /

Rebute  In RR8 at States Exhibits I'm excluded from the fiberglass split, and the Ace wrap.

Perjury  She said in RR4 at 171) Line 23 thru 25 I used this Arm to subdue her thats a lie also DNA cleared me of this one also

① 

Perjury In RR 4 at 182) Line 1 thru 25) District Attorney ask Amanda Smith, did you grab a shirt that belonged to your ~~daut~~ daughter to wipe your face off with? Amanda Smith said Yes, sir. What kind of shirt was that? Amanda Smith says it was a Hello kitty shirt, white. And when you wiped your face off, could you see that there was a lot of blood on it? Amanda Smith says, There was a lot of blood ~~on~~ ~~and~~ everywhere. ~~Deceffected~~

Rebute In in RR 4, at 182) Line 10 thru 12) District Attorney ask Amanda Smith ~~Okay~~ Now, when you were in the ambulance, do you remember what you were wearing? Amanda Smith said (Just a T-Shirt) white on 1-19-2013 In front of the house before she went to the hospital

Rebute
Now in RR 4 at 158) Line 8 thru 9 Amanda smith states she is wearing a big white T-shirt in the Ambulance

Perjury
In RR 4 at 85) Christian Owen states in Line 14 Amanda smith, This is her blue shirt that she was wearing. That morning when she got to the hospital

Perjury
In RR 4 at 226) Line 23 thru 25/ Deputy Jenkins states and the District Attorney ask Deputy Jenkins All right. When you saw her in the ambulance, was she wearing a blue pajama shirt?

Aggravated Perjury/ Testimony by State witnesses

⑫

Perjury
RR4, at 226) Line 25) Deputy Jenkins states
I believe it was blue, yes.

Perjury In RR4, at 18) Line 14) District Attorney ask
Gary Caskey, Okay. But when she was taken
out, did she have any other clothes on at
all other than that blue shirt? Gary Caskey
states No. That's how she was dressed
and didn't have any shoe's on.

Perjury  Amanda Smith Stated serveral times during
when she was testifly that she was
not my girlfriend and she said she wasn't
having sex with me. Well the record and
DNA Test results show that. The Black
pajama pants was found in Gary Caskey's
bedroom at the foot of the bed by Deputy
Jenkins after we returned to the ~~crime~~
house that morning. The Record reflects
that I took Amanda Smith out the house
with a Big white T-shirt and in a pair of
paneys what Gary Caskey and Amanda
Smith says. Amanda said she left her
pajama Bottoms at the foot of Gary Caskey's
bed. When we was gone in her vehicle that
morning she said I took her to a secluded
wooded area off of Cherry Larual then
too a brigde this is where she said I rape'd
her which I didn't. The pajama pants prove

that me and her was haveing sex before the incerdent happen'd. She lies about this under oath to the jury and the Judge. Because Deputy Jenkins stated, he ask Amanda where her bottom cloths was and she said she left them at the foot of Gary Caskey's Bed that night when I caught them having sex. The black pajama pants prove that I was having consentual sex with her all the way up to Jan 18, 13 My seman was detected in the crouch of these pants with another male Seman also. Gary Caskey testified and said he was not having sex with her but if you check that other DNA that was also present in Amanda Smiths vaginal it will be Gary Caskey's which he also Committed Aggravated Perjury on the witness stand to this question Plus the gray sweat pants thay went in the house and got them that morning for Amanda why she was in the Ambulance the DNA results came back to be Three Male DNA was Detected on these gray sweat pants. And these was her gray sweat pants that came out that front bedroom that she was sleeping with me in that she lied about also on the stand

Perjury If you will look at the little girl in the picture sleeping on the floor in the living room it shows that she is cover'd up with that lepared Blanket Amanda Smith said she had in the vehicle that Rebute night. Plus the Orange and Black Blanket is on my bed in the Front bedroom if you will look at the pictures

Page 36 and 37 Line 19 thru 25 on Page 36
RR5 at Okay 15A-2 is the sperm fraction of the
Rebute gray sweatpants. The sperm fraction came back to be a mixture of three people. Now explain to the jury how that's possible.
RR5 at 37) 1 thru 4) Well, okay, so I also put that Amanda
Rebute Smith and Gary Mount could not be excluded. So Amanda Smith and Gary Mount are there. And then there is another individual.

Now this also proves she was having sex with me before the incerdent that she lied about on the wittness stand and said she didn't have sex with me are Gary Caskey Re-test the DNA For Gary Caskey's DNA and you got her in a Big Big lie She all ready done told so many lie's that I've pointed out to Yall which did cause me to get sentence to Aggravated sexual Assault

Perjury In RR.4, at 210 Part 2 of 2) Line 19 thru 25) James Dousay talking to the District Attorney. I received a phone call from the complainant sometime later. When you say sometime later, about how long later? It was about a day or two later. Okay. She advised that she had a couple of items RR4, at 211) Line 1 thru 7) of evidence that I needed to pick up from her. Where did those items come from? She said that they had been on her during the time of the attack. All right. And what were those two items? There was a gray jacket and an orange and black blanket.

Perjury In RR8, State's Exhibit 81) Page 1 of 8) It shows that James Dousay did not submitt the (Orange and Black Blanket) (and Gray Jacket) until 1-31-2013 now the incedent happen'd on 1-19-13 and he said he got a call two days later from the complainant she had more Items to give him that she said was on her during the attack

Rebute In RR.4, at 80) Line 24) Christian Owen said she was wrapped in a leopard print blanket. and she was wearing gray pants. Blue shirt



Rebute In RR 4, at 223) Line 1 thru 25) Deputy Jenkins states that he gets a pair of Black Pajama pants out of Gary Caskey's Bed room off the floor at the foot of Gary Caskey's bed. This was on the morning of 1-19-13 they was not ever submitted to the lab until 1-22-13 By J.T. Porter These pants was found after the Sexual Assault had accured in the woods and the bridge these pants was found in the house after the incedent had happen'd and was over with.

Rebute In RR 5, at 41) Line 6 thru 10) Christy Smejkal tells the District Attorney. For 21C-1--21 is actually the gray jacket. It was consistent with a mixture of DNA from at least two individuals. Gary Mount was excluded from it.

Perjury In RR 4, at 193) Line 20 thru 23) Mr. Haynes ask Amanda Smith, Did you have sex with Mr. Gary Mount on that evening at all before you were taken out of the house? No, sir In RR 4, at 223) Richard Jenkins.

Rebute went into the house and recovered a pair of pajama pants. I asked her where her bottoms were, because she was wrapped in a blanket. In the Ambulance. This was after the incerdent happen'd. My Seman was in these pajama pants because we had sex on the couch that night before the incerdent.

Now in Amanda Smiths Audio Statement and verbal Statement she said she had on and was wearing Hello Miss Kitty white and Pink shirt when she left the house that night. It also states this in the police report. Then she stated when I was supposed of took her in the woods and raped her she was completly necked in the woods and supposly at the bridge also. Now when she was back at the house in the Ambulance she stated she had a white T-shirt on and somebody or one of the officers went in the house and got her a pair of gray sweetpants. to put on because she had left her black pajama bottoms at the foot of Gary Caskey's bed. ~~Watchland~~ Where I caught them having sex at that morning and she had been sleeping with me all this time. Now she also had a leopard print blanket wrap'd around her also that morning she had with her. But their was none of my DNA found on it. They didn't even do no DNA test on it look at the state Exhibits. their's a picture of it but no Test DNA Results from it. Now this was took from the victim at the hospital that morning plus the white t-shirt she had on change to a blue ~~Tshirt~~ shirt be time she got to the hospital that morning.

The leopard Blanket had 11 seman stains on it but did no DNA Test on it to see who it belong to now Amanda had this with her at the hospital She said it came out her Suburban but it came out of the landlords house I seen it on his bed a time or two

(17)

In RR.4, at 158) Line 24 thru 25) District Attorney ask Amanda Smith, Okay, Now, when you were in the kitchen on the phone, do you remember what happened next?

Perjury  In RR.4, at 159) Line 1 thru 8) I remember it getting to the point to where I had to go wake up Gary Caskey or go to his room to tell him that I couldn't -- he wouldn't leave me alone. Did you go into Gary Caskey's room? Yes, I did. When you went in there, was he awake? I woke him up, I believe. All right. Where were you sitting and

Perjury  In RR.4, at 160) Line 1 thru 11) where was Gary Caskey sitting when you talked to him? I was all the way in this corner. Okay. Where was Gary Caskey? Do you remember? He -- I believe he was up standing, getting ready to come in.

Rebute  In RR.3, at 137) Line 7 thru 10) Gary Caskey Say's, Well, I wake up. And I hear Amanda talking on the phone, as I'm coming to go to the bathroom. And I go to the bathroom, and she's on the phone talking loud. And she's just laying in the floor. Okay. And when you say, "she was laying on the floor," was she laying on her back? Yes. Okay. And what was she doing while she was In RR3, at 138) Line 1 thru 9) on the phone -- or I'm sorry -- while she was laying down? Talking and -- talking to someone. Do you know who

she was talking to? To my understanding, it was Kevin. And who is Kevin to Amanda Smith? A previous boyfriend of hers. All right. Now, while she was sitting there on the floor, what was she wearing? Pajamas.

Perjury In RR3, at 140) Line 3) He didn't like the idea she was talking on the phone. ~~that is not you~~

In RR3, at 140) Line 15 thru 25) All right. Was he looking at her? Oh, yeah. And when you say he was looking at her, what was he doing? Staring real wide-eyed. All right. And it was while she was on the phone on the floor? Yes. Okay. Now, where were you standing while this was all going on?

Perjury In RR3, at 141) Line 1 thru 6) Okay. I went back to my bedroom. All right. Now, when you went-- well, let me ask you this: Why didn't you ask Gary --or try to calm Gary down again about Amanda? She was still on the phone when I walked back in the bedroom.

In RR3, at 141) Line 9 thru 11) And when you went back in the bedroom--I'm showing you 13-- where did you go? I went back to my bed.

In RR3, at 141) Line 20 thru 25) When Amanda came in the room, did she appear to be upset? Yes. Did she appear to be agitated? Yes. aggravated Aggravated. In RR3, at 143) Line 9 thru 13) So when Amanda was in your room, was she standing



or sitting at that point? She was standing at the doorway talking to me.

In RR3, at 143) Line 23 thru 25) All right. I'm showing you State's 12, was this doorway open when she was talking to you? In RR.3, at 143) Line 1) Yes. sir

Perjury

In RR3, at 147) Line 9 thru 25) All right. How long did she talk to you in your room? At the doorway? Yes. At least 15 minutes. All right. And when she was talking to you, where was Gary? In the living area. All right. I didn't have my eyes on him the whole time. All right. Now, after about 15 minutes of talking to her, what did you do? I was tired. I sat on the end of the bed, and she sat down beside me.

GARY LEE CASKEY'S
Aggravated Perjury
Testimony Under Oath
On The Witness Stand

Perjury  In RR3, at 122) Line 19 thru 22) District Attorney
says, Okay. Now, when Amanda Smith came to your
house, did she have a place to call home at that
point? Gary Caskey says, NO.

Rebute  In RR4, At 191) Line 24 thru 25) Mr. Haynes Ask,
Amand Smith, Is it true that Mr. Gary Caskey,
when he found you, that you were living in
your car in the In RR4, At 192) Line 1 thru 2)
Suburban? Amanda Smith Says, No, sir. That
is incorrect.

Perjury  In RR3, At 125) Line 8 thru 11) Gary Caskey Says, She
was staying in that-- that front bedroom. And
Gary was sleeping on the couch. And the two
kids would either-- I think they would sleep
with her.

Rebute  In RR3, At 116) Line 2 thru 6) District Attorney ask,
Gary Caskey, Okay. Is that the room that Gary Mount
was sleeping in-- Gary Caskey Says, Right.
District Attorney's Says, Originally? Gary Caskey
Says, Yes.

Rebute  In RR4, At 149) Line 4 thru 9) District Attorney ask,
Amanda Smith, Now, when you moved in with Gary
Caskey, can you tell me what room that you and your

Rebute  daughters were going to stay in? Amanda Smith says, We were staying in the living room? District Attorney says, You were staying in the living room? Amanda Smith says, Yes.

Perjury  In RR3, At 128) Line 19 thru 25) District Attorney Ask, Gary Caskey? Okay. So after -- who all went with you to take Amanda to the hospital that day? Gary Caskey says, I believe it was me and Gary and the two kids. (The oldest one was in school that day) I'm not sure if we -- we would have went in the Suburban. That would have been the only way we could have all went. District Attorney Ask Okay. whose car did you guys take? In RR3, At 129) Line 1 thru 3) Gary Caskey says, It would have been in her Suburban. District Attorney says, All right. Gary Caskey says, It's the only way we could have all rode.

Rebute  In RR4, At 152) Line 9 thru 13) District Attorney Ask, Amanda Smith, Okay. And who took you to the hospital? Amanda Smith says, Gary Caskey has the vehicle, so he drove. I mean, I can't remember if my children were there. I think Gary Mount might have went, too. I can't quite remember.

In RR3, At 130) Line 12 thru 14) District Attorney Ask Gary Caskey, Okay. Did she go to school that day, if

③

you remember? Gary Caskey says, As far as I know, she did? (1-19-2013 was a Saturday morning) No School)

Perjury In RR3, At 131) Line 11 thru 13) Gary Caskey says, And then around 7:00pm, 7:30 pm, he had to go get some money from his uncle in Rosenberg, Tx. And he asked me if I would take him. (We went to
Rebute Rosharon, Texas that night not to Roseburg) (My uncle address if you want to check Richard Alford 3191 Tigner Road Rosharon, Texas)

Perjury In RR3, At 131) Line 19 thru 22) District Attorney Ask Gary Caskey, All right. About how long did it take for you to get from you house to Rosenberg? Gary Caskey Says, Oh, over an hour. Over an hour.
Perjury I'd say an hour and 15 minutes or better. (Now from Huffman, Texas Northeast Harris County) To the Southwest far corner of Fort Bend County Rosharon, Texas Its 70 miles one-way. At rush hour in Houston Traffic comeon now) Then he
Perjury said In RR3, at 132) We left there at 8:15 pm headed back to Huffman.)

Perjury) In RR3, At 133) Line 10 thru 19) Gary Caskey says, He was agitated because he couldn't get Amanda on the phone. District Attorney says, Was he trying to call her on the cell phone? Gary

④

**Perjury** Caskey says, Yes, sir. District Attorney Ask, Okay. How many times did he try to call her on the cell phone? Gary Caskey Says, Numerous. District Attorney Ask? Was he able to get her on the phone? Gary Caskey Says, No.

**Rebute** Gary Mounts my name My cell Phone Provider is Strait talk you Can Court order the phone records and see I did talk to her that night only two times and ask her what kind of cigarettes did she want and what kind of wiskey did she want. My cellphone Number is 850-419-0700 This was the night of Jan 18, 2013 around 8:30 to 10:00 pm

**Perjury** In RR3, At 142) Line 4 thru 9) District Attorney Ask, Gary Caskey, Was she whispering -- why was she whispering? Gary Caskey Says, Because he wouldn't -- she said that he would not leave her alone. She -- he wanted to be in a relationship, ~~could~~ and she didn't want to be in a relationship with anyone.

**Rebute** In RR 3, At 146) Line 13 thru 17) District Attorney ask Gary Caskey, Did you talk to her about Gary wanting a relationship? Mr. Haynes: Your Honor, I object to that as being -- Gary Caskey Says. No.

⑤

Perjury  In RR 3, At 153) Line 1 thru 2) Gary Caskey states As I was coming into the room, he said, You're not going to disrespect me ---. Line (7) also he says, I heard him say it. In Line 24 thru 25 He said, You, re not going ta disrespect me like that.

Rebute  In RR 3, At 153) Line 14 thru 15) Gary Caskey States, He didn't say anything. I started trying to calm him down.

Perjury  In RR 3, At 161) Line 23 thru 25) District Attorne Ask Gary Caskey, When he had her like that, was it around her chest or her head? Gary caskey States, Her neck.

Perjury  In RR 3, At 162) Line 24 thru 25) District Attorney ask Gary Caskey, All right. So when he made it out the door, Okay, you indicated he had her by the neck? In RR 3, At 163) Line 1) Gary Caskey said, Right.

Rebute  In RR 8, At States Exhibit (82) on Page 2 of 5 It says, There is insufficient information to determine whether Gary Mount (k1) is a contributor to this Mixture which is (Item-8-1 L-Neck Swab Item-7-1 is the R. Neck swab and I was excluded from it look at Page 3-of 5 S-Exhibit 82

⑥

Perjury   In RR 3, At 166) Line 16) Gary Caskey said, Now, she -- he had her by the neck. ( DNA test excluded me from her neck swabs)

Very k
drunk
confused
Perjury   In RR 3, At 166) Line 20 thru 21) Gary Caskey is very confused with his own self he says, Well, she's -- he's dragging her, you know. I don't know what that means, you know.

Perjury   In RR 3, At 167) Line 4) Gary Caskey says, I go in the drivers door.

Rebute
Rebute   In RR 4, At 192) Line 7 thru 10) Mr. Haynes Asks, Amanda Smith, Okay. Now that Suburban that you have there, is it true that that front drivers side door is jammed and doesn't open? Amanda Smith says, Yes.

Perjury   In RR 4, At 15) Line 10 thru 11) District Attorney Ask Gary Caskey what did you say there? Gary Caskey says, Into the chest of drawers.

Rebute   In RR 4, At 15) Line 16 thru 18) Gary Caskey states He hit her against the wall in the bedroom. I heard her hit the bed and the wall, but did not see that.

① 

Perjury In RR4, At 16) Line 18 thru 19) Gary Caskey stated He had on, Cutoff jeans and an old shirt is what I remember.

Rebute In RR4, At 57) Line 23 thru 25) Mr. Haynes ask, Gary Caskey, Okay, You also stated that when you saw Mr. Gary Mount leaving your residence the night of the incident, that he wasn't wearing any shirt; is In RR 4, At 58) Line 1) Mr. Haynes: that correct, Gary Caskey states in Line 2 thru 3) That's the way I remembered it. I told 911, so that's what I thought

Rebute In RR 4, At 158) Amanda said she was wearing a big T-shirt.

Perjury In RR4, At 18.) Gary Caskey said she was wearing a ~~allentap~~ Blue pajama Top on the 911 Tape. (Not a Big T-shirt

Perjury In RR4, At 19) Line 3 thru 9) Gary Caskey ~~says,~~ stated, I said that he's very dangerous. He had told me that prior. District Attorney says, Okay, Did he ever tell you about his knowledge of martial arts? Gary Caskey says, Yes, sir. District Attorney says, What did he say about that? Gary Caskey states, He demonstrated moves. (Have not ever showed him any moves Plus never took Martial Arts Training

⑧

Perjury In RR4, At 20) Line 21 thru 25) District Attorney ask Gary Caskey, When you saw her standing there, did you notice any ~~wounds~~ wounds on her? Gary Caskey says, She was holding her head and crying. District Attorney says, Could you Perjury see what was on her head? Gary Caskey says, Yes, a goose egg. I put ice or either -- Page 21 of RR4 at 21) ice wrapped in a towel, I believe, I tended to it. District Attorney says, Do you know where she got that goose egg? Gary Caskey says, Outside. District Attorney Says, Who gave it to her. Gary Caskey stated, Gary.

Rebute In RR4, At 208) Line 4 thru 5) District Attorney Ask James Dousay (FBI Agent) (Investigater For the Shrieffs Office) When you saw Kaley Smith, did she have any injuries to her face. (Line 10) thru 12) James Dousay States, I did not notice any on her face. I asked her if she had pain. She complained of pain to the back of her head. (Line 16) thru 19) District Attorney Ask James Dousay, Did you see any kind of lump to the back of her head? James Dousay Said, I did not. She had hair Covering that area.

⑨

**Perjury** In RR4, At 21) Line 10 thru 11) Gary Caskey states, She was standing at the gate at one point ((when I went back in to get the phone))

**Rebuts** In RR4, At 9) Line 17 thru 18) Gary Caskey states, As I'm dialing the phone for 911, that he's kidnapping her. (Now you said earlyer in your testimony you had your phone with you.) You didn't go back in the house.

**Perjury** In RR4, At 23) Line 24 thru 25) Gary Caskey states, He drug her out. He beat her and then he drug her out of here

**Rebuts** In RR4, At 55) Line 3 thru 18) Mr. Haynes Ask, Gary Caskey, All right. You stated that at the time that Amanda and Mr. Gary Mount emerged from that room -- Gary Caskey says, Yes, Sir. Mr. Haynes says, that you didn't see any injuries on Mrs. Amanda Smith. Was that your testimony? Gary Caskey says, Yes, Sir. Mr. Haynes says, Okay. All right. Even though you have testified that you believe that he slung her around inside the room, you still testified that you didn't see any injuries when she came out of the room; is that correct? Gary Caskey says, Thats correct. (Even though you said in your 911 Call and up above

(10)

Rebute
Rebute In RR4, At 23) Line 24 thru 25) He beat her and then he drug her out of here ((And you just stated under Oath that she didn't have no injuriers that kind of hard to believe when I was surpose to beat her and slung her around)) In RR4, At 23) Line 20) (You stated you witnessed a beating.)

Perjury In RR4, At 25) Line 6 thru 8) Gary Caskey states I just knew she would. When I saw her in that room, she was dazed. And I didn't know if she might have a concussion. (You just stated up above you did not see no injurys on her after I was surpose to beat her up and you also said you didn't see what happened in that room and you didn't come in that room eiather.

Perjury In RR4, At 29) Line 8 thru 12) Gary Caskey says, I didn't stay that long. District Attorney says, Okay. Where did you go? Gary Caskey says, I ran outside and I ran into the first officer and told him that the sergeant needed help because he was in an awkward position. He was backed to the bed. It's a small area, the closet.

Perjury
Rebute

In RR4, At 29) Line 13 thru 14) Gary Caskey stated And then I hollered outside for them to come in.

①

**Perjury** In RR4, At 27) Line 16 thru 21) District Attorney ask Gary Caskey, Did you talk to the sergeant as well Gary Caskey states, Yes, sir. District Attorney **Perjury** ask, And did you relay to him what you had told on the 911 tape and also the other officers? Gary Caskey Says, Yes, sir. I made a statement to him. (None of this statement or Evidence was admitted into the record at trial it was withherld by the District Attorney along with the Audio recordings I'm requesting and you court order the courts to provide to me by 9-16-15 which I did not get.)

Line 16 thru 22)

**Rebute** In RR4, At 36) District Attorney Ask Gary Caskey, about how long did the officers stay around? **Rebute** Gary Caskey says, Long enough for me to make a statement and they photographed. District Attorney ask Gary Caskey, Okay. When you made the statement do you remember who you made the statement to? Gary Caskey says, I want to say it was a Detective Dupree.

**Perjury** In RR4, At 37) Line 8 thru 15) District Attorney ask Gary Caskey, Okay. Could you see more injuries on **Perjury** her when you went to the hospital? Gary Caskey says, Yes, I did. District Attorney ask, What kind of injuries did you see? Gary Caskey says, The inside of her left leg was all bruised.

⑫

Perjury District Attorney says, Okay. Before they left, were there any injuries to her legs? Gary Caskey says, Rebute No, sir. (Mr. Caskey explain how ~~accusion~~ you Rebate saw bruising to the inside of her left leg at the hospital and the Rape Technition had Amanda in a robe and she was also covered up in a blanket). This is what the rape technition said).

In RR.4, At 37) Line 16 thru 21) District Attorney ask Gary Caskey, All right what other kind of injuries did you see? Gary Caskey says, ~~well~~ The eye had darkened and the lip was still--you know, swelling and cracked--split. District Attorney says, Okay. Gary Caskey says, The Top Lip.

Rebute In RR8, At States Exhibit (27) & (28) Amanda Smiths Top lip is not swelling, cracked or split open. As Gary Caskey says it is.

Rebute In RR4, At 31) Line 13 thru 19) Gary Caskey stated Rebut well, when I went in, she started crying and-- but immediately I saw her with a red -- a real red eye and busted lip that was bleeding --you know, it stopped bleeding, but you could see residue. District Attorney says, Did you see any of the bruises on her? Gary Caskey says, Not at that time. (Now she had a blanket wrap around her in the Ambulance, But you saw threw the robe and blanket at the hospilat to see the brusies

(13)

In RR4, At 38) Line 19 thru 23) District Attorney ask Gary Caskey, Did you ever collect any evidence for the police in this case? Gary Caskey states I showed him some pajamas. He asked me. District Attorney ask, Who's "he"? Gary Caskey says, the Detective.

*Perjury*

In RR4, At 223) Line 10 thru 25) District Attorney ask, Richard Jenkins, All right. After you talked to Amanda, what did you do next? Deputy Jenkins states, We went into the residence -- and recovered a pair of pajamas pants. District Attorney ask, Why did you go recover those pajama pants? Deputy Jenkins states, I asked her where her bottoms were, because she was wrapped in a blanket. Deputy Jenkin also, States. And she told me they were in the bedroom. District Attorney ask Deputy Jenkins, Okay, When you went to go pick these pajama pants up, did you have idea if these were actually involved in the sexual abuse -- Deputy Jenkins says NO. District Attorney says -- or the Kidnapping? Deputy Jenkins says, NO.

*Rebute Deputy Rebute Rebute Rebute Rebute Rebute*

In RR4, At 40) Line 9 thru 18) Gary Caskey states, I remember, as he was dragging her out the gate, she had lost her footing about -- right at the place -- just before you get to the gate,

*Perjury*

(14)

Perjury
Rebute
Rebute
Rebute
Rebute

about 12, 13 feet before you got to the gate, she had lost her footing and was falling down. (In-Regards to Statements of victim on Compact Disk, Amanda Smith stated she walked out that house that night and got in the vehicle and drove off.) (I Lissoned to this compact Disk in the Harris County jail when Eric Davis my Lawyer brought it in for me to Lisson to it under a Court Order from the Lower Courts.

Perjury In RR4, At Pages: 41-42-43-44-45-46-47-48-49-50-51 (If you will read these pages you will see that Mr. Caskey was so High and drunk on vodka and pills that he could not even tell you which way we went to Rosharon, Texas not Rosenburg, Texas He was so drunk he couldn't even tell you if we was drunk dont even no what time we left or what time we got back and only place we stop that night was at a Exxon Station in Arcola, Texas and at my Uncle house no where else he said we didn't even have no stop signs or red Lights to stop at. Look at RR4 At 43) Line 23 thru 25) In RR4, At 44) Line 1 and 2)

(15)

Perjury In RR4, At 59) Line 24 thru 25) Mr. Haynes asks Gary Caskey, Okay. Did you drag any wood in your yard at all? Did you chop some wood down in your yard and In RR4, At 60) Line 1 thru 2) drag it through your yard? Gary Caskey says, Not to my knowledge.

Rebute Rebute In RR8, At States Exhibit (5) Photo) Look to the right side of the photo is this wood he drug into his yard and also cut up are is my eyes playing tricks on me (Agg. Perjury) (Look at the wood pile right by the back of the boat)

Rebute Rebute In RR4, At 62) Line 13 thru 23) Mr. Haynes ask Gary Caskey, (He admitts to cut up wood and dragging wood in his yard) The question calls for a yes or no answer. And question is: Some of those marks that were in the picture, were they caused by wooden pallets or garbage cans or any wood being dragged and your boat being dragged? Were some of those marks caused by that in those pictures that we had? Gary Caskey says, In the total picture? Mr. Haynes says, Yes. Gary Caskey says, It very well could be.



(16)

In RR4, At 65) Line 22 thru 25) Mr. Haynes Ask Gary Caskey, When Mr. Gary Mount and Ms. Amanda Smith left your residence that night Gary Caskey says, Yes, sir. Mr. Haynes ask Gary Caskey, who was driving that Suburban?

*Perjury* In RR4, At 66) Line (1) Gary Caskey says, Gary was.

*Perjury* In RR4, At 66) Line 6 thru 12) Gary Caskey States I couldn't see exactly who was driving — *Perjury* where he pushed — like I said, he shoved her inside and he got inside the drivers side door. Mr. Haynes ask Gary Caskey, Okay. So you didn't see who was driving? Gary Caskey Says, No, not at that — time. Mr. Haynes says, Okay. So you're not sure who was driving? Gary Caskey says, I'm not — not sure.

*Rebute* In RR4, At 192) Line 7 thru 10) Mr. Haynes ask, *Rebute* Amanda Smith, Okay. Now, that Suburban that you have there, is it true that that front driver's side door is jammed and doesn't open? Amand Smith says, Yes.

*Rebute* In RR4, At 192) Line 13 thru 17) Mr. Haynes ask Amanda Smith, Is it true that if someone wanted to enter and exit the vehicle, they

(17)

Rebute had to enter and exit the passenger side because of the front door [sic] being jammed. Amanda Smith Says, YES.

Rebute In RR4, At 192) Line 18 thru 21) Mr. Haynes ask Amanda Smith, There's no way that anyone could have gotten in and out of the driver's side door; is that correct? Amanda Smith Says, Not through the door.

Rebute In RR4, At 66) Line 13 thru 16) Mr. Haynes ask Gary Caskey, All right. On the night in question where this alleged incident occurred, did you have any sex with Ms. Amanda Smith? Gary Caskey Says, NO, Sir.

Rebute I Gary Lee Mount Swear under penalty of Agguvated perjury that I did Catch Ms. Amanda Smith and Mr. Gary Caskey having sex in his bedroom when I walked in on them she was surpose to be my girlfriend her and Gary Caskey both lied about this I had sex with her on 1-18-13 at 6:00am that morning

Rebute In RR8, At States Exhibit (82) Laboratory Report, Page 2 of 5 It states in (3) paragraph Down on the Summary of Results And

(18)

Rebute →
Rebute →
Rebuto →
Rebuto →
Rebute

interpretations: The DNA results obtained from the sperm fraction of Item 2A-1 (2A-1SR) are consistent with a mixture of DNA from at least two individuals. The DNA results of the major contributor to this mixture are consistent with the DNA results obtained from item (K2). Therefore, Gary Mount (K2) cannot be excluded as a possible major contributor to this mixture. There is insufficient information to determine whether Amanda Smith (K1) is a contributor to this mixture. (This is her vaginal now and theres insufficient information) (Under chapter 64 I request DNA Testing to be re-did on all Evidence.

In the Black pajamas pants, grey sweatpants Blue shirt, gray jacket, Leopard Blanket, all had another male DNA on them besides mine Mine was found on pajamas pants, grey sweatpants, that was got out the house after the sexual Assault had already been comitted up the road these two pair of pants was not in the vehicle when the sexual assault was supposed to of happened.

Amanda and My DNA was the only one submitted for comparsion

(19)

In RR4, At 66) Line 22 thru 25) Mr. Haynes ask Gary Caskey, But earlier yesterday you stated that Ms. Amanda didn't live with her dad. And she was living out of her car, is that correct? Gary Caskey states, At the point where we had--when she came

Perjury

In RR4, At 67) Line 1 thru 2) to my house, she was living in her vehicle or staying in it at night.

Perjury

Rebute

In RR4, At 191) Line 24 thru 25) Mr. Haynes Ask, Amanda Smith, Is it true that Mr. Gary Caskey, when he found you, that you were living in your car in the ~~suburbuan home~~ In RR4, At 192) Line 1 thru 2) Suburban? Amanda Smith says, No, sir. That is incorrect.

Rebute

Rebute

Rebute

# PRAYER

Appellant prays that this Honorable Court finds that each issue in this brief to be true, and grant relief by remanding this case to the trial Court for a New Trial.

Appellant prays that this Court grant him relief as the Court finds appropriate in this Appeal.

(1.)

# CERTIFICATE OF SERVICE

Appellant certify that a true and correct copy was mailed to the Court OF Appeals Honorable Clerk, to mail a copy to the Appellee State. Appellant is indigent and unable to have access to a copier or printer to provide Appellee with a copy as Appellant has hand written his brief. I also ask a copy be made and sent back to the Appellant.

Sincerely,
Gary Mount
TDCJ#1969963
McConnell Unit
3001 S. Emily Drive
Beeville, Texas 78102

(1)

# 3RD ISSUE

## PAGES:

Insufficient Evidence